(CHANCERY.)

## ORR v. HODGSON *et ux. et al.*

Bill for rescinding a contract for the sale of lands, on the ground of defect of title, dismissed with costs.

An alien may take an estate in lands by the act of the parties, as by purchase; but he cannot take by the act of the law, as by descent.

Where a person dies, leaving issue, who are aliens, the latter are not deemed his heirs in law; but the estate descends to the next of kin who have an inheritable blood, in the same manner as if no such alien issue were in existence.

The 6th article of the treaty of peace between the United States and Great Britain, of 1783, completely protected the titles of British subjects to lands in the U. S. which would have been liable to forfeiture, by escheat, for the defect of alienage. That article was not meant to be confined to confiscations *jure belli.*

The 9th article of the treaty between the U. S. and G. B., of 1794, applies to the title of the parties, whatever it is, and gives it the same legal validity as if the parties were citizens. It is not necessary that they should show an actual possession or seizin, but only that the title was in them at the time the treaty was made.

The 9th article of the treaty of 1794 did not mean to include any other persons than such as were British subjects or citizens of the U. S.

APPEAL from the Circuit Court for the District of Columbia.

The appellant filed his bill in equity in the Court below, stating, that, on the 10th day of January, 1816, he purchased of the defendants, William Hodgson, and Portia, his wife, and John Hopkins, and Cornelia, his wife, a tract of land called Archer's Hope, situate in the County of James' City, in the State of Virginia, for the sum of 5,000 dollars, and gave his bond to the said Hodgson and Hopkins for

the payment of the said purchase money.  That, at the time of the purchase, the defendants affirmed to the plaintiff, that they were seized in right of the said Portia and Cornelia, of a good, sure, and indefeasible estate of inheritance, in fee simple, in the said tract of land, and had full power and lawful authority to convey the same, and, in consequence of such affirmation, the plaintiff made the purchase, and gave his bond, as aforesaid.  And further stating, that he had since discovered that the defendants had no title to the said lands, but that the title thereto was either vested in the children of the Countess Barziza, or that the Commonwealth of Virginia was entitled to them by escheat.  That Colonel Philip Ludwell, a native of the said Commonwealth, being seized in fee of the said lands, had two daughters, Hannah and Lucy, born of the same mother, in Virginia.  That, some years before the year 1767, he removed with his family, including his said two daughters, to England, where he died, in the year 1767, having, by his last will, devised all his estates to his said two daughters, and appointed as their guardians, Peter Paradise, John Paradise of the city of London, and William Dampier.  That Hannah, one of the said daughters, married William Lee, a native of Virginia, and died, leaving issue, two daughters, the said defendants, Portia Hodgson and Cornelia Hopkins, who are citizens of Virginia, residing in the District of Columbia.  That Lucy Ludwell, the other daughter abovementioned, during her infancy, to wit, in May, 1769, at the city of London, married the said John Paradise, a British subject, by

whom she had issue, a daughter, by the name of Lucy, born in England, about the year 1770. That the said Lucy Paradise, daughter of the said John and Lucy Paradise, on the 4th of April, 1787, at the said city of London, married Count Barziza, a Venetian subject, by whom she had issue, a son, named John, born in the city of Venice, on the 10th of August, 1796. That the said John Paradise, in the year 1787, came to Virginia with his wife, and returned with her to England, in 1789, where he died, in 1796, having, by his last will, devised all his personal estate, charged with some pecuniary legacies, to his wife, but making no disposition of his real estate, and leaving no issue, but the Countess Barziza. That the said Countess Barziza died intestate, in Venice, on the 1st of August, 1800, leaving her said sons, John and Philip, her only issue; and that neither her sons, nor herself, nor her husband, were ever in the United States. That the said Count Barziza is also dead. That the said Lucy Paradise, after the death of the said John Paradise, her husband, treated the said lands as her own, exercising acts of ownership over the same, and, about the year 1805, re-returned to Virginia, where she died intestate, in 1814, being in possession of said lands at her decease, and leaving no issue but the two sons of Countess Barziza above mentioned, who, at the time of her death, had not become citizens or subjects of any other state or power than Venice and Austria. That by marriage articles, made before the marriage of John Paradise and Lucy Ludwell, between the said John Paradise of the first part, the said Peter Paradise, his father,

of the second part, the said Lucy Ludwell of the third part, the said William Dampier of the fourth part, and James Lee and Robert Carry of the fifth part, reciting the said intended marriage, and that the said Peter Paradise had agreed to pay his son 4,000*l.* sterling at the marriage, and that his executors should pay 4,000*l.* sterling more to Lee and Carry upon the trusts therein after mentioned. And that the said John Paradise, and Lucy, had agreed, that all the estates of the said Lucy Ludwell, should be settled as therein after mentioned, but that, by reason of her infancy, no absolute settlement of the same could then be made. It was witnessed, that in consideration of the marriage, and for making provision for the said Lucy Ludwell, and the issue of the said John Paradise, on her body to be begotten, and for the consideration of ten shillings to the said John Paradise, paid by the said Lee and Carry, and for divers other good causes and valuable considerations, him, the said John Paradise thereunto moving, he the said John Paradise covenanted with said Lee and Carry, that if the marriage took effect, he would make, or cause to be made, such acts and deeds as would convey all the estates of the said Lucy Ludwell to the said Lee and Carry, upon trust, as to that part of the real property, which was situate in Virginia. 1. To the use of John Paradise for life, remainder to the use of all or any of the children of the marriage, for such estates (not exceeding estates tail) as John Paradise and the said Lucy Ludwell, by deed, during the coverture or as the survivor of them, by deed or will should appoint, and in default

of such appointment, to the use of all the children of the marriage as tenants in common in tail with cross remainders in tail, remainder to the use of such person as the said Lucy Ludwell should appoint, and in default of such appointment, to the use of the survivor of John Paradise and Lucy Ludwell in fee simple. 2. With power to the husband and wife, to make leases not exceeding twenty-one years. 3. With power to the trustees to sell any part of the estate, and apply the proceeds to the purchase of other lands in England, subject to the use of the marriage articles. And as to the personal estate of the said Lucy Ludwell, to the use of John Paradise for life, remainder to Lucy Ludwell for life, remainder to the children of the marriage as the parents should appoint, and in default of such appointment, to the use of all the children of the marriage, share and share alike: But if there should be no children of the marriage, or being such, if all of them should die before the age of twenty-one, or marriage, then to the use of such person as the said Lucy Ludwell should appoint, and in default of such appointment, to the survivor of the said John Paradise and Lucy Ludwell in absolute property. And as to the second of the said sums of 4,000l. to the trustees upon trust for the use of John Paradise for life, remainder to Lucy Ludwell for life, remainder to the children of the marriage, in the same manner as the personal estate of the said Lucy Ludwell was settled: Provided, that if there should be no issue of the marriage, then to the use of John Paradise in absolute property. Provided, also, that it should and might be

lawful for the trustees, with the consent of the said John Paradise and Lucy Ludwell, or the survivor of them, and after the death of such survivor, of their or his own authority, to lay out the same in lands in England to the use of John Paradise for life, remainder to Lucy Ludwell for life, remainder to the children of the marriage in the same manner as the lands of the said Lucy Ludwell were settled. That after the death of the said Peter Paradise, the said John Paradise, as his executor, paid the last mentioned 4,000*l.* to the trustees aforesaid, who invested it in the British funds, and by deed dated the 8th of December, 1783, and to which the said John Paradise and Lucy Ludwell were parties, they declared the same subject to the uses of the marriage settlement. The bill further alleged, that the plaintiff, upon discovering the foregoing circumstances, applied to the defendants, and requested them to rescind the contract, and to deliver up the bond to the plaintiff to be cancelled, the same having been obtained by misrepresentation or through mistake without any consideration valuable in law, and at the same time offered to convey back to them any title, interest or estate, which might have been conveyed to him by the defendants. But that the defendants refused, and threatened to bring a suit at common law upon the said bond, and to enforce payment thereof, contrary to equity. Concluding with the usual prayer for a discovery, &c. and for a decree rescinding the sale of lands, and that the defendants should be compelled to deliver up the bond to be cancelled, and for further relief, &c.

To which bill the defendant demurred.

The bill was dismissed by the Court below with costs, and the cause was brought by appeal to this Court.

The cause was argued by Mr. *Jones* for the defendants and respondents, no counsel appearing for the appellant.

Mr. Justice STORY delivered the opinion of the Court. The whole merits of this cause rest upon the question, whether the defendants, Portia Hodgson, and Cornelia Hopkins, took an estate in fee simple, in one moiety of the land stated in the bill, by descent, as nieces and heirs of Lucy Paradise, widow of John Paradise, upon her death in 1814. If they did, then the contract for the sale of the land to the plaintiff ought to be fulfilled; if not, then the contract ought to be rescinded.

Two objections are urged against the title. First, that Lucy Paradise, at the time of her death, was a British subject, and so not capable of passing the land in question by descent; secondly, if so entitled, yet, upon her death, the land escheated to the commonwealth of Virginia, for want of heirs legally entitled to take the same by descent.

It appears, that Lucy Paradise took her moiety of the estate in question by devise from her father, Philip Ludwell, who was a native of Virginia, where, also, his daughter Lucy was born. Sometime before the year 1767, he removed with his family, including this daughter, to England, where he died in

1767. In 1769, this daughter was married in England to John Paradise, (a British subject,) by whom she had issue a daughter, Lucy, who was born in England, about 1770, and who, afterwards, in 1787, in England, married Count Barziza, a Venetian subject, by whom she had two sons, one born in Venice in February, 1789, and the other in Venice, in August, 1796, both of whom are now living. The Countess Barziza died in Venice, in August, 1800, leaving no other issue except her two sons, and neither she, nor her husband, nor her sons, were ever in the United States. In the year 1787, John Paradise came with his wife to Virginia, and returned with her to England in the year 1789, where he died in 1796. After the death of her husband, Lucy Paradise treated the land in controversy as her own, exercising acts of ownership over it; and about the year 1805, returned to Virginia, where she died intestate, in possession of the land, in 1814, leaving no issue but her two grandsons, the children of the Countess Barziza, and the defendants Portia and Cornelia, her nieces, who would be her heirs at law if no such issue were living.

An alien may take by purchase, but not by descent.

From this summary statement, it is clear, that the two sons of the Countess Barziza are aliens to the commonwealth of Virginia, and, of course, cannot take the estate in question, by descent from their grandmother, unless their disability is removed by the treaty of 1794. For though an alien may take an estate by the act of the parties as by purchase; yet he can never take by the act of the law, as by descent, for he has no inheritable blood. But the

objection now supposed to exist is, that under these circumstances, although the grandsons cannot, as aliens, take by descent; yet they answer in some sort, to the description of " heirs," and, therefore, prevent the estate from descending to the nieces who have a legal capacity to take, because, strictly speaking, they are not heirs. The law is certainly otherwise. Where a person dies, leaving issue, who are aliens, the latter are not deemed his heirs in law, for they have no inheritable blood, and the estate descends to the next of kin, who have an inheritable blood, in the same manner as if no such alien issue were in existence.[a] In the present case, therefore, the defendants, the nieces of Lucy Paradise, are her heirs at law, entitled to take by descent, whatever estate could rightfully pass to her heirs, unless the British treaty of 1794 enlarged the capacity of her grandsons to take by descent, a point which will be hereafter considered. And this brings us to the other question in the cause, whether Lucy Paradise, under the circumstances of the case, had such an estate in the land, as could by law pass by descent to her heirs.

There is no question that she took an estate in fee simple by devise from her father; but it is supposed, that although born in Virginia, by her removal to England, with her father, before, and remaining there until long after, the American revolution, she must be considered as electing to remain a

1819.

Orr
v.
Hodgson.

Where a person dies, leaving issue who are aliens, the latter are not deemed his heirs in law; but the estate descends to the next of kin, who have an inheritable blood in the same manner as if no such alien issue were in existence.

(a) 2 Bl. Com. 249. Duroure v. Jones, 4 T. R. 300. Com Dig. Alien. C. 1.

British subject, as well by operation of law, as by the statutes of Virginia on this subject, because an alien to that commonwealth. And if she became an alien, then the estate held by her could not pass by descent, but for defect of inheritable blood escheated to the government.[a]

Admitting that Lucy Paradise did so become an alien, it is material to inquire what effect the treaty of peace of 1783 had upon her case ; and upon the best consideration that we can give to it, we are of opinion that the sixth article of that treaty[b] completely protected her estate from forfeiture by way of escheat for the defect of alienage. That defect was a disability solely occasioned by the war, and the separation of the colony from the mother country ; and under such circumstances, a seizure of the estate by the government, upon an inquest of office, for the supposed forfeiture, would have been a confiscation of the property in the sense in which that term is used in the treaty. When the 6th article of the treaty declared, " that no future confiscation should be made," it could not mean to confine the operation of the language to confiscations *jure belli* ; for the treaty itself

a *Com. Dig. Alien.* C. 2. *Co. Litt.* 2. *b.*

b Which provides, " that there shall be no future confiscations made, nor any prosecutions commenced, against any person or persons, for, or by reason of, the part which he or they may have taken in the present war ; and that no person shall, on that account, suffer any future loss or damage, either in his person, liberty, or property ; and that those who may be in confinement on such charges, at the time of the ratification of the treaty in America, shall be immediately set at liberty, and the prosecutions so commenced be discontinued."

extinguished the war, and, with it, the rights growing out of war ; and when it further declared, that no person should, on account of the part he had taken in the war, suffer any future loss or damage, either in his person, liberty, or property, it must have meant to protect him from all future losses of property, which but for the war would have remained inviolable. The fifth article of the treaty also materially illustrates and confirms this construction. It is there agreed, that Congress shall recommend to the State legislatures to provide for the restitution of all estates of British subjects, &c. which had been confiscated. Yet, why restore such estates, if, *eo instanti*, they were forfeitable on account of alienage ? This subject has been heretofore before us, and although no opinion was then pronounced, it was most deliberately considered. We do not now profess to go at large into the reasoning upon which our present opinion is founded. It would require more leisure than is consistent with other imperious duties ; and we must, therefore, content ourselves with stating, that the doctrine here asserted is the decided judgment of the Court.

If the case were not protected by the treaty of 1783, it might become necessary to consider whether it is aided by the ninth article of the treaty of 1794, which declares, that British subjects, who now hold lands in the United States, shall continue to hold them, according to the nature and tenure of their respective estates and titles therein, and that as to such lands, and the legal remedies incident thereto, neither they, nor their heirs or assigns,

1819.

Orr
v.
Hodgson.

The 9th section of the British treaty of 1794, applies to the title of the parties, at the time the treaty was made, and gives it the same legal validity as if they were citizens. It is not necessary that they should have an actual seizin or possession.

shall be regarded as aliens. It does not appear, by the bill in this case, that Lucy Paradise was in the actual possession or seisin of the land at the time of the treaty. Nor is it necessary, because the treaty applies to the title, whatever it is, and gives it the same legal validity as if the parties were citizens.[a] But although it does not directly appear by the bill what the title of Lucy Paradise was, at the time of the treaty ; yet, as the title is asserted in her, both before and after the treaty, and there is no allegation of any intermediate transfer, it must be presumed in this suit, that she never parted with her title. It follows, that in this view also, her title was completely confirmed, free from the taint of alienage ; and, that by the express terms of the treaty, it might lawfully pass to her heirs.

The 9th article of the British treaty of 1794, did not mean to include any other persons than British subjects or citizens of the United States.

And here it becomes material to ascertain whether the treaty of 1794, under the description of heirs, meant to include any other persons than such as were British subjects or American citizens, at the time of the descent cast ; and it is our opinion, that the intention was not to include any other persons. It cannot be presumed, that the treaty stipulated for benefits to any persons who were aliens to both governments. Such a construction would give to this class of cases privileges and immunities far beyond those of the natives of either country ; and it would also materially interfere with the public policy common to both. We have, therefore, no hesitation to reject any interpretation which would give to persons, aliens to both

a Harden v. Fisher, 1 *Wheat. Rep.* 300.

governments, the privileges of both ; and in this pre-dicament are the children of the Countess Barziza. The rule, then, of the common law, which gives the estate to the next heirs having inheritable blood, must prevail in this case.

We have not thought it necessary to go into an examination of the articles for a marriage settlement entered into between Lucy Paradise and John Para-dise, on their marriage, for two reasons : first, the articles were merely executory, and, being entered into by Mrs. Paradise when under age, and not after-wards ratified by her, they were not binding upon her ; secondly, if they were binding, yet, inasmuch as the only persons in whose favour they could now be executed are aliens incapable of holding the estate to their own use, no Court of Equity would, upon the general policy of the law, feel itself at liberty to decree in their favour.

Decree dismissing the bill affirmed, with costs.[a]

a Mr. Chief Justice MARSHALL did not sit in this cause.