RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0337p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

>
*Plaintiff-Appellee*,

*v.*

MILDER ESCOBAR-TEMAL,

*Defendant-Appellant*.

No. 24-5668

─────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:22-cr-00393-1—Eli J. Richardson, District Judge.

Argued:  March 21, 2025

Decided and Filed:  December 15, 2025

Before:  STRANCH, THAPAR, and DAVIS, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:**  Alex Thomason, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant.  Nicholas J. Goldin, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.  **ON BRIEF:**  Alex Thomason, Caryll S. Alpert, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant.  Joseph Montminy, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

STRANCH, J., delivered the opinion of the court in which DAVIS, J., concurred, and THAPAR, J., concurred in the judgment only.  THAPAR, J. (pp. 23–54), delivered a separate opinion dissenting in part and concurring in the judgment.

---

**OPINION**

---

JANE B. STRANCH, Circuit Judge.  Milder Escobar-Temal is a citizen of Guatemala who came to America unlawfully over a decade ago and resides in Nashville, Tennessee.  In October 2022, police found three firearms in Escobar-Temal's residence, and he was charged with unlawful possession of a firearm under 18 U.S.C. § 922(g)(5)(A), which prohibits unlawfully present individuals from possessing firearms.  Escobar-Temal now appeals his conviction, arguing that § 922(g)(5)(A) is unconstitutional facially and as applied to him.  For the following reasons, we **AFFIRM**.[1]

## I.  BACKGROUND

Escobar-Temal was born in Guatemala in 1987.  While in Guatemala, he married and had one daughter.  His daughter had a serious intestinal deformity that resulted in significant medical bills for the family.  Escobar-Temal was unable to pay those bills in Guatemala either through work or through bank loans, so he unlawfully entered the United States to find employment.  Since 2012, Escobar-Temal has been living in Nashville and working steadily as a flooring contractor.  His only criminal record is a 2016 charge for driving without a drivers' license, which was dismissed later that same year.  Escobar-Temal divorced his first wife and, in 2018, remarried.  He has two children with his second wife, both of whom are United States citizens.

On October 12, 2022, Nashville police officers responded to a call from Escobar-Temal's wife alleging that he was sexually abusing her 14-year-old daughter—Escobar-Temal's stepdaughter.  The police conducted a search incident to arrest and found three firearms in Escobar-Temal's residence: one on a couch and two in the bedroom Escobar-Temal shared with his wife.

---

[1]Judge Thapar's writing concurs in the judgment only because it agrees that "Escobar-Temal's conviction was consistent with the Second Amendment."  Conc. opn. at 54.  It dissents with respect to the majority's holding that the Second Amendment's reference to "the people" includes some level of constitutional protections for unlawfully present persons.

On December 12, 2022, the Government charged Escobar-Temal with unlawful possession of a firearm while illegally present in the United States, in violation of 18 U.S.C. § 922(g)(5)(A). Escobar-Temal moved to dismiss the indictment, arguing that, on its face, § 922(g)(5)(A) is unconstitutional under the Second Amendment. The Government countered that § 922(g)(5)(A) does not violate the Second Amendment for two reasons. First, the Government argued that the Second Amendment—which protects the "right of *the people* to keep and bear arms"—does not encompass non-citizens (both lawfully present and unlawfully present) because they are not part of "the people." U.S. Const. amend. II. (emphasis added). Second, the Government contended that there is a longstanding historical tradition of disarming groups analogous to lawfully and unlawfully present immigrants.

The district court denied Escobar-Temal's motion. Although it reasoned that the Second Amendment's reference to "the people" likely encompasses unlawfully-present individuals, it declined to firmly hold as much and instead resolved the matter on the Government's second argument. In doing so, the court reasoned that, at the founding, there was a tradition of disarming those who did not swear allegiance to the state, which satisfies the Government's burden of demonstrating that § 922(g)(5)(A) aligns with historical firearm regulation.

Following the court's denial of his motion, Escobar-Temal pled guilty to the single-count indictment and reserved his right to appeal the denial of his motion on grounds that § 922(g)(5)(A) is unconstitutional. The district court accepted Escobar-Temal's guilty plea and sentenced him to twelve months and one day in prison and three years of supervised release.

## II. ANALYSIS

Escobar-Temal argues that 18 U.S.C. § 922(g)(5)(A) violates the Second Amendment, rendering his conviction thereunder unconstitutional. Section 922(g) provides that

It shall be unlawful for any person—

*** 

(5) who, being an alien—

(A) is illegally or unlawfully in the United States; or

> (B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));
>
> ***
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment therefore confers "an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). But that right is not unlimited. *Id.* at 626. Throughout modern history, the right to bear arms has been restricted based on "the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 (2022).

In *Bruen*, the Supreme Court provided the framework for determining whether a firearm regulation violates the Second Amendment. *Id.* A court considering such a challenge must first determine whether the Second Amendment's plain text covers the defendant's conduct. *Id.* at 24. If so, the Second Amendment presumptively protects that conduct, and the Government must then "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* We consider each step in turn.

## A. Coverage of The Second Amendment

Both parties agree that the Second Amendment protects the conduct at issue in this case—keeping firearms inside the home. But the Second Amendment refers not merely to the "right to keep and bear arms," but to the "right of *the people*" to do so. The Government contends that individuals not lawfully present in the United States are not part of "the people" and do not, therefore, have Second Amendment rights. We apply the *Bruen* framework to analyze these issues.

1. <u>The Second Amendment's Plain Text</u>

We begin with whether Escobar-Temal's conduct falls within the Second Amendment's plain text. The phrase "right of the people" appears in the First, Second, and Fourth Amendments. U.S. Const. amend. I ("Congress shall make no law respecting . . . the right of the people peaceably to assemble."); *id.* amend. II ("[T]he right of the people to keep and bear arms, shall not be infringed."); *id.* amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.").**2** The Supreme Court has confirmed that this phrase has the same meaning throughout the Bill of Rights and has used its understanding of "the people" in the First and Fourth Amendments to guide its interpretation of the same phrase in the Second Amendment. *See Heller*, 554 U.S. at 579–80; *accord United States v. Williams*, 113 F.4th 637, 649 (6th Cir. 2024) (using the same methodology to conclude that individuals with felony convictions are part of "the people" in the Second Amendment because they have Fourth Amendment rights).

Supreme Court precedent indicates that an individual's mere presence in the United States is not sufficient to confer First, Second, and Fourth Amendment rights when she unlawfully entered the country. *See United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904) ("[An individual] does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law."); *Bridges v. Wixon*, 326 U.S. 135, 161 (1945) ("Since an [individual who unlawfully enters] obviously brings with him no constitutional rights, Congress may exclude him in the first instance for whatever reason it sees fit."). As *Turner* and *Bridges* teach, when a person first unlawfully enters this country, he has no Second Amendment rights because his only connection to the country is his presence therein, and he brings no rights under the United States Constitution from outside the country.

The Supreme Court has suggested that "the people" protected by the First, Second, and Fourth Amendments "refers to a class of persons who are part of a national community or who

---

**2**We analyze these constitutional provisions because they are the closest textual analogues to the Second Amendment's reference to "the right of the people." As the Supreme Court explained in *Heller*, the Constitution's other references to "the people" in Article I, Section 2 and the Ninth and Tenth Amendments are distinguishable because they refer to "the people" in a context other than the rights of the people. 554 U.S. at 579.

have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). Immigrants enjoy constitutional protections once they are physically present in the United States and have "developed substantial connections with this country." *Id.* at 271. The Court in *Verdugo-Urquidez* acknowledged that some unlawfully present individuals might meet this test but found that the individual defendant in that case—who had been present involuntarily only for a matter of days—did not. *Id.* at 272–73. The Court indicated that substantial connections could include entering voluntarily and accepting some societal obligations. *Id.* at 273.

Our own precedent suggests that those who have developed sufficient connections to this country include at least some unlawfully present individuals. We have, for instance, enforced the Fourth Amendment rights of individuals unlawfully present in the United States. *United States v. Urrieta*, 520 F.3d 569, 572, 579 (6th Cir. 2008) (suppressing evidence obtained during a search when challenged by an individual presumed unlawfully present). And despite the Concurrence's assertion to the contrary, our decision does not stand alone. Conc. opn. at 46. The Seventh Circuit recently declined to overrule or abrogate its decision that unlawfully present individuals can be part of "the people" for Second Amendment purposes. *United States v. Carbajal-Flores*, 143 F.4th 877, 881–82 (7th Cir. 2025) (discussing *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015)). The Eleventh Circuit explained that it "can't rule out the possibility that at least *some* illegal aliens might, during their stays here, 'have otherwise developed sufficient connection with this country to be considered part of [the people].'" *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022). And other circuits have rejected arguments that "the people" categorically excludes unlawfully present individuals and instead, have assumed, without deciding, that the Second Amendment's protections extend to such individuals. *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168–70 (10th Cir. 2012); *United States v. Torres*, 911 F.3d 1253, 1260–62 (9th Cir. 2019); *United States v. Perez*, 6 F.4th 448, 453 (2d Cir. 2021).

Further reinforcing this view, the Court in *Verdugo-Urquidez* looked to the scope of "persons" under the Fifth and Fourteenth Amendments as a guide to the scope of "the people" under the First, Second, and Fourth Amendments. *Id.* at 270–71. And the Supreme Court has

been even clearer that unlawfully present individuals are entitled to constitutional protections in those contexts. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."). Applying that same meaning to "the people" in the Second Amendment indicates that noncitizens hold the right "to keep and bear arms," provided they are "part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Verdugo-Urquidez*, 494 U.S. at 265.

Rather than citing caselaw disproving this point, the Government and the Concurrence rely on cases confirming that U.S. citizens have the right to bear arms. *See, e.g.*, Appellee's Br. 21–24; Conc. opn. at 47–48. Both note that while untangling whether the Second Amendment provided a right to private weaponry, the Court in *Heller* repeatedly referred to the Second Amendment as a "right of citizens" to do various things. 554 U.S. at 595 ("Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*."). And both reference our citation to *Heller* in *Williams*, when describing the right as belonging to "all Americans."[3] 113 F.4th at 649 (quoting 554 U.S. at 580).

But at no point in these opinions did the Supreme Court or this circuit, even in dicta, limit "the people" to citizens. The fact that the Second Amendment certainly encompasses all U.S. citizens does not mean that it excludes those who are not. *See Williams*, 113 F.4th at 646 (quoting *United States v. Rahimi*, 602 U.S. 680, 702 (2024)) ("While *Bruen* discussed the rights of ordinary, law-abiding citizens under the Second Amendment, it said nothing about the status of citizens who were not law-abiding—much less that *only* law-abiding citizens have Second Amendment rights.") (citation modified). Further, this reading of *Heller* would place it at odds with the Constitution itself. As the Eleventh Circuit has noted, "[t]he Constitution's text shows

---

[3]The Concurrence inaccurately asserts that *Heller* expressly limited the meaning of "the people" to "citizens," claiming that "All seven 'provisions of the Constitution that mention "the people"' use the term 'unambiguously' to refer to American citizens." Conc. opn. at 37 (citing *Heller*, 554 U.S. at 580). *Heller* actually says: "[I]n all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.

that when the Framers meant to limit a provision's application to 'Citizen[s]' *per se*, they did so expressly." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022) (second alteration in original) (citing U.S. Const. art. I, § 2, cl. 2; *id.* art. I, § 3, cl. 3; *id.* art. II, § 1, cl. 5; *id.* art. IV, § 2, cl. 1). Thus, any argument, based in *Heller* or otherwise, that the Second Amendment's use of "the people" includes only citizens is bound to fail.

To avoid this conclusion, the Government points to a litany of historical sources that it claims suggest individuals unlawfully present in the United States have been historically excluded from the right to bear arms. These sources may be useful—but not at this stage. As elucidated in *Williams*, a group may be historically excluded from the right to bear arms while, nonetheless, being part of "the people." 113 F.4th at 649–50. As then Judge Barrett noted in her dissent in *Kanter v. Barr*, prior to the Supreme Court clarifying the relevant framework

> There are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope. Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right.

919 F.3d 437, 451–52 (7th Cir. 2019) (Barrett, J., dissenting) (citations omitted). The Supreme Court's approach in *Rahimi* comports with the second framework proposed by Justice Barrett. 602 U.S. at 693. In that case, the Court analyzed history and tradition to determine not whether a historical tradition justified excluding a class of individuals from "the people," but whether history and tradition justified stripping this right from a segment of "the people." *See id.* Applying that framework here, the Government's ample historical evidence does not demonstrate that unlawfully present individuals are excluded from "the people." Rather, it relates to the second step of our analysis: whether the Government has met its burden of showing that disarming individuals unlawfully present in the United States is consistent with our nation's tradition of firearm regulation.

While current precedent does not compel a historical analysis of how "the people" was understood at the time of the founding, and despite the Concurrence's misconstruction of our argument, we do find a historical analysis useful. We turn to that now.

2.　Historical Analysis of "the People"

A historical analysis of "the people" confirms that the term includes U.S. citizens as well as those with sufficient connections to the country that they are considered part of the national community.　Despite ample historical evidence to the contrary, the Concurrence attempts to fuse the terms "citizens" and "the people" into a singular meaning.[4]　But that construction creates an unnecessary redundancy and is "disfavored."　*Fischer v. United States*, 603 U.S. 480, 496 (2024); A. Scalia & B. Garner, Reading Law § 26, p. 150 (2012).　Limiting "the people" to citizens only, moreover, does not align with the Founders' intent or the historical understanding of the term.

At the time of the founding, the concept of illegal immigration did not exist as we know it today.　Ascertaining who constitutes "the people," therefore, cannot rely on a contemporary understanding of illegal immigration.　It must grow from the term's meaning at the time the Constitution was adopted.　*See* A. Scalia & B. Garner, Reading Law § 26, p. 150 (2012).　At that time, restrictions on immigration were minimal.　Aviva Chomsky, UNDOCUMENTED: HOW IMMIGRATION BECAME ILLEGAL (2014).　The Naturalization Acts of 1790 and 1795 outlined the process for achieving citizenship, but they did not restrict who could enter the country.　It was not until the late 1800s that the federal government attempted to control immigration.　David H. Reimers, "History of Recent Immigration Regulation," 136 Proceedings of the American Philosophical Society 176, 176 (1992).　Thus, the term "the people" is best understood as having encompassed all individuals present in the United States who were loyal to the country and had consented to be governed by its newly established laws.　And history defined that group as those with sufficient connections to the country.

---

[4]The Concurrence cites some founding-era texts to argue that "the people" was limited to citizens only, but a number of these texts are inapposite.　For example, several discuss how the country dealt with alien *enemies*—those who were disloyal to the country and the Constitution—and what rights they should have.　*See, e.g.*, Conc. opn. at 29 (discussing Washington's Farewell address and the external threat from "the insidious wiles of foreign influence"), *and* at 29 (arguing "[Thomas] Jefferson stressed that aliens were barred from conveying property, bringing suits for money damages, and engaging in the political process" when Jefferson was referring to Tories and those political enemies disloyal to the newly formed United States).　But at issue here is what the Founders thought about those people who voluntarily came to this country, expressed loyalty to the government, and consented to its laws.

Early English jurists as well as the Founders believed that people with sufficient connections to this country—not just citizens—were entitled to constitutional protections. English jurist William Blackstone—the "preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593 (citation omitted)—posited that the government must protect the "alien" who resides in its territory, 1 William Blackstone, *Commentaries* 354 (1765). Blackstone considered "the *people*" to include "aliens and natural-born subjects"—though he concluded that each group held a different set of rights. *Id.* at 366. As James Madison—a prominent Republican and the Bill of Rights' principal author—explained:

> [I]t does not follow, because aliens are not parties to the Constitution, as citizens are parties to it, that whilst they actually conform to it, they have no right to its protection. Aliens are not more parties to the laws, than they are parties to the Constitution; yet it will not be disputed, that as they owe, on one hand, a temporary obedience, they are entitled, in return, to their protection and advantage.

4 Jonathan Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution, 556 (Taylor & Maury eds., 2d ed. 1836). Early American dictionaries also indicated that membership in "the people" was determined based on one's connection to the community and not by citizenship. For example, Webster defined "the people" as the "body of persons who compose a community, town, city, or nation," Noah Webster, *American Dictionary of the English Language* 600 (1st ed. 1828), while Johnson defined it as a "nation; those who compose a community," 2 Samuel Johnson, *A Dictionary of the English Language* 305 (6th ed. 1785). Thus, the Founders used "citizens" and "the people" deliberately, to mean different things, depending on how far they wanted to extend the constitutional provision.[5]

The crux of the Concurrence's argument is that "the people" must have been limited to citizens because only citizens could consent to be governed and could vote. It points to a variety

---

[5]As to some sources cited to show that the Founders distinguished between citizens and noncitizens, the Concurrence argues that noncitizens did not have any rights because they did not "acquir[e] every right of a native citizen" until naturalization. Conc. opn. at 29. But that the Founders did not grant noncitizens every right does not mean that they were given no rights. Indeed, the Founders understood citizens to have the greatest constitutional protections, but those present in the United States, having consented to its government but not yet having been naturalized, were entitled to some—but not all—of the Constitution's protections. And those present in the United States without citizenship and without sufficient connections enjoyed the least constitutional protections. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022).

of founding-era texts, early state constitutions, and constitutional provisions tying "the people" to those who could vote.[6] But it incorrectly incorporates a present-day context in which noncitizens are not permitted to vote. At the time of the founding, noncitizens could vote. Ron Hayduk, *Immigrant Voting Rights and the Quest for Universal Suffrage*, 60 HARV. C.R.-C.L. L. REV. 317, 324–25 (2025). Eleven of the thirteen original colonies permitted noncitizens to vote, and by the American Revolution, noncitizen voting was "firmly established." *Id.* at 324. Noncitizens voted under the early constitutions of Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Ohio, Rhode Island, Vermont, and Virginia. Virginia Harper Ho, *Noncitizen Voting Rights: The History, the Law and Current Prospects for Change* 18 Law & Inequality 271, 273–74 (2000). Voting rights were tied to gender, race, property ownership, and national loyalty but not citizenship. *See id.* at 275. Based on history and tradition, then, "the people" encompassed those individuals who voluntarily came to this country, consenting to be governed by the Constitution and its laws, and in turn, received some—but not all—of the Constitution's protections.

Because the Second Amendment's reference to "the people" encompasses unlawfully present individuals with sufficient connections to the national community, we must examine Escobar-Temal's connections. He arrived in the United States in 2012 and lived in the same community for approximately a decade until his detention. During that time, he consistently worked as a flooring contractor and had two American citizen children. Such connections are sufficient to establish that he was part of the national community given that he voluntarily moved here, has no criminal convictions,[7] held a job, and established a family. The Concurrence, however, asserts that we "award constitutional rights" to "noncitizens who live in a certain way," such that we might "extend constitutional rights to the married investment banker while denying

---

[6]Many of these texts refer only to "the people" but do not mention citizens. The Concurrence asserts that they must mean citizens but supports this conclusion only with the mistaken assumption that, at the time of the founding, only citizens could vote, so only they had political power. *See, e.g.*, Conc. opn. at 30 (citing James Madison's Federalist No. 57, which states that "the people" have "the right and the capacity . . . to choose their own rulers."). The Concurrence also argues that the government's legitimacy "ought to rest on the solid basis of THE CONSENT OF THE PEOPLE," citing Federalist No. 22 written by Alexander Hamilton—an immigrant himself.

[7]Given our Nation's insistence on the presumption of innocence until proven guilty, we cannot at this stage say that merely being charged with a crime is sufficient to remove someone from "the people" and its attendant constitutional protections.

them to the childless electrician." Conc. opn. at 53. But we do no such thing; we do not determine sufficient connections based on a certain type of job, marital status, or the number of children one has. Instead, we employ the "sufficient connections" test—first used by the Founders and reiterated by the Court in *Verdugo-Urquidez*—to look holistically at the facts before us to determine whether an individual has sufficient connections to this country to be considered part of the national community. Courts are well-versed in that type of fact-specific analysis. *See, e.g.*, *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (establishing sufficient minimum contacts test for personal jurisdiction). Based on the facts in the record, we hold that Escobar-Temal's connections are sufficient to make him part of "the people." Accordingly, we now turn to the second step of the *Bruen* analysis—whether the Government can regulate Escobar-Temal's right to possess a firearm.

**B.  Historical Analysis of Firearms Regulations Imposed on Noncitizens**

Having determined that the Second Amendment applies here, we must now address whether history and tradition support disarming individuals such as Escobar-Temal. There is a substantial history of governmental disarmament of noncitizens and other political or demographic groups seen as lacking a regulable relationship to the government. We note at the outset that many of these colonial and early American positions on gun rights were based on racial, ethnic, gender, and religious classifications that reflected a worldview suspicious and disdainful of anyone who was not white, male, and landowning. *See* Pratheepan Gulasekaram, *"The People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. Rev. 1521, 1545–46 (2010) (collecting laws we would now consider discriminatory). Many of them "offend both modern mores and our current Constitution." *Williams*, 113 F.4th at 657.

But because we are bound by the *Bruen* framework, the Founders' conceptions of who should bear arms provides the constitutional guardrails for our Second Amendment jurisprudence. It is our job to separate the important underlying principles of the relationship between governmental interests and individuals' right to bear arms from the troublesome applications of those principles employed by the Founders. Thus, the Founders' understanding of the appropriateness of various gun laws must be translated into the modern context to find

their constitutionally sound (and hopefully less troublesome) analogues. *Rahimi*, 602 U.S. at 692. We begin with the background setting prior to the time of the Founders.

Under the 1689 English Bill of Rights, the right to bear arms was not available to the whole population living in England. *See Heller*, 554 U.S. at 594. Rather, it was available only to the "Subjects which are Protestants"—excluding both non-subjects and Catholics (and presumably individuals of other faiths). English Bill of Rights 1689, 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 ("[Said] Lords Spiritual and Temporal, and Commons, . . . declare . . . [t]hat the Subject which are Protestants, may have Arms for their Defense suitable to their Conditions, and as allowed by Law."). The English conception of the "subject" morphed directly into the American conception of a "citizen" to describe the membership in a nation in a manner "better suited to the description of one living under a republican government" as opposed to a monarchy, and often the term "citizen" was adopted in the place of the term "subject" by the States upon their separation from Great Britain. *Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 166 (1874). Following this etymological shift, one can interpret the English Bill of Rights as restricting the right to bear arms to Protestant citizens.

At common law, unlawfully present individuals were considered part of "such persons as fall under the denomination of the *people*." 1 William Blackstone, *Commentaries on the Laws of England* 354 (1765). But they were considered distinct in both their rights and their responsibilities. *Id. at* 354–62. Natural-born or naturalized (through allegiance) subjects of the Crown were considered to inherently hold "a great variety of rights." *Id.* at 359. Those who were neither natural-born nor naturalized subjects, by contrast had rights that were "much more circumscribed." *Id.*

Similarly, in the colonies, it was widely understood that a noncitizen had many rights often reserved to the people, including the freedom of speech, the freedom of the press, the freedom of religion, and the right to own personal property, sue in a court of law, and enter into contracts. Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998). But the right to bear arms was widely understood to be a political right that was reserved to the subset of the citizenry that was permitted to vote and serve on juries. *Id.* Indeed, in the early founding, military rights like the right to bear arms were often intimately linked with the right to

vote, with the understanding that the group of people who would fight for a political body should be co-extensive with the group who had a say in its political organization. *Id.* (discussing the connections between suffrage and armed military service from the colonial period through World War II).

Indeed, in many early American colonies, far from allowing all residents the right to bear arms, the legislatures passed laws criminalizing giving arms to Native Americans, who were considered resident aliens. *See, e.g.*, 1 Records of the Governor and Company of the Massachusetts Bay in New England 392 (Nathaniel B. Shurtleff, ed., 1853) [hereinafter Mass. Bay Records] (detailing a 1629 demand for increased punishment for those who broke the ban on providing Native Americans with guns or munitions); Act of March 31, 1639, 1639 N.J. Laws 18 (prohibiting colonists from selling guns, powder, or lead to the Native Americans); Act of May 9, 1723, 1723 Conn. Pub. Acts 292 (similar). In some cases, this was the result of specific violence arising between the Native American communities and the colonists. 1639 N.J. Laws 18–19 (justifying the law on grounds that the possession of Guns by Native Americans "hath already caused much mischief"). In others there was no proof of wrongdoing, but a concern that even friendly Native American communities could not be prevented from passing the guns along to wrongdoers once they had obtained the weapons. 1723 Conn. Pub. Acts 292 (justifying the law on grounds that the Native Americans to whom colonists lent guns occasionally "withdraw themselves for a time to the Enemy Indians" and that said "Enemy Indians" were "Generally Supposed to be guilty (though it is hardly to be proved) of killing many Deer.").

As both political and religious strife arose in the colonies in the early 1700's, the litmus test for arms bearing was even more closely tied to allegiance to the sovereign nation. In Massachusetts for instance, as a punishment for seditious libel—that is, speaking against the government—offenders were disarmed. Mass. Bay Records 211. They could regain their arms only by disavowing their political speech and acknowledging their previous position to be sinful. *Id.* at 212. In Virginia, one could only bear arms if one was willing to swear allegiance to the British Crown (over and above any foreign powers like the Pope) using the following text:

> I do sincerely promise and swear, That I will be faithful and bear true Allegiance, to his Majesty King George. I do swear that I do from my Heart abhor, detest, and abjure, as impious and heretical, that damnable Doctrine and Position, That

Princes excommunicated or deprived by the Pope, or any other Authority of the See of *Rome*, may be deposed or murdered by their Subjects, or any other whatsoever.  And I do declare, That no Foreign Prince, Person, Prelate, State, or Potentate hath, or ought to have and Jurisdiction, Power, Superiority, Pre-eminence, or Authority, Ecclesiastical or Spiritual, within this realm.

An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government, Laws of Virginia ch. 4, 35–36 (1756) (requiring reputed "papists" to take the oath prescribed by the following act and disarming any man refusing to take the oath of "arms, weapons, gunpowder or ammunition."); An Act for the Further Security of his Majesty's Person and Government, 1 George I, stat. 2, ch. 13 (providing the text of the oath).  Individuals so disarmed could regain the right to bear arms only by swearing undivided allegiance to the king. Laws of Virginia ch. 4, 38.

As the political tides changed, during the Nation's founding, the Founders maintained the assumption that one should not allow individuals loyal to a foreign sovereign or unregulable by domestic sources to possess firearms, although their conception of domestic government had changed.  No longer was allegiance to the British Crown the deciding factor for gun ownership. *Williams*, 113 F.4th at 653–54.  Instead, it was loyalty to the new, revolutionary government. *Id.* Revolutionaries worried that loyalists would arm themselves against the revolution and aid the British government.  Thursday March 14, 1776, in 1 *Journals of the American Congress From 1774 to 1788*, at 285 (Way & Gideon eds., 1823).  Thus, many of the colonies disarmed the loyalists at the behest of the Continental Congress.  An Act for Restraining and Punishing Persons Who Are Inimical to the Liberties of this and the Rest of the United Colonies, and for Directing Proceedings Therein, 1775, in *The Public Records of the Colony of Connecticut* 192–93 (Charles Hoadly ed., 1890).  Disarmed individuals could regain their weapons when and only when they proved themselves amenable to revolutionary rule. *Id.*

One of these provisions, The Pennsylvania Test Act, is particularly instructive.  It required all white men over eighteen to swear an oath declaring allegiance to the Commonwealth and to repudiate the oath they had taken to the British Crown.  An Act Obliging the Male White Inhabitants of this State to Give Assurances of Allegiance to the Same and for Other Purposes Therein Mentioned, 1777, in 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 110–

11 (James T. Mitchell & Henry Flanders eds., 1903) [hereinafter *Pa. Statutes at Large*]. Any man rejecting the required oath was to be disarmed. *Id.* at 112–13. The oath provided as follows:

> I, [name], do swear (or affirm ) that I renounce and refuse all allegiance to George the Third, King of Great Britain, his heirs and successors, and that I will be faithful and bear true allegiance to the commonwealth of Pennsylvania as a free and independent state, and that I will not at any time do or cause to be done any matter or thing that will be prejudicial or injurious to the freedom and independence thereof, as declared by Congress; and also that I will discover and make known to some one justice of the peace of the said state all treasons or traitorous conspiracies which I now know or hereafter shall know to be formed against this or any of the United States of America.

*Id.* at 111–12. A 1786 revision of the act even went so far as to make the taking of the oath the sole requirement for citizenship. An Act for Securing to this Commonwealth the Fidelity and Allegiance of the Inhabitants Thereof and for Admitting Certain Persons to the Rights of Citizenship, 1786, in *Pa. Statutes at Large* at 178–79. At the time, many Quakers found the oath repellant to their religious views and declined to take it, thereby losing the right to bear arms. Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 159 (2007).

These laws—as potentially fraught as many of them would be under today's standards—teach several important lessons about the Founders' conception of the right to bear arms. The first is the one developed in *Williams*: "governments in England and colonial America long disarmed groups that they deemed to be dangerous. Such populations, the logic went, posed a fundamental threat to peace and thus had to be kept away from arms. For that reason, governments labeled whole classes as presumptively dangerous." 113 F.4th at 657. The second is more subtle: a group may have been dangerous enough to disarm in the eyes of the Founders, not because individuals within that group were inherently dangerous people—or even because the membership of that group was statistically more likely to be dangerous or criminal than the general population—but because the group did not have a sufficient connection to the sovereign government to provide that government confidence in its ability to regulate the group's conduct with guns.

It is true that sometimes a group was considered "dangerous" because it was actively in conflict with the rest of the population.  As we have noted, many laws disarming Native Americans were the result of tensions that "often flared between settlers and indigenous people" resulting in war and violence.  *Id.* at 652.  Catholic disarmament arose "[a]s various rulers— some Catholic and others Protestant—battled for control of the British Isles, [and] violence abounded." *Id.* at 651.

But not all group disarmaments were the direct result of violence already committed or even a tendency toward violence in a particular group.  Both the disarming of Quakers unwilling to take loyalty oaths, and the rapid shift from disarming those who were not loyal to the British Crown to disarming those who were not loyal to the Revolution, suggest that dangerousness can lie, not only in an inherent tendency towards violence, but also in the lack of relationship between the sovereign and the disarmed group.  Similarly, the decision to disarm Native American tribes, even those friendly with the colonists, because their later actions with the weapons could not then be regulated indicates that the Founders concluded that danger could lie in a lack of sovereign control.  It is unsurprising, therefore, that noncitizens were among the groups frequently disarmed and that common law commentators did not believe noncitizens held the same weaponry rights as citizens.

Colonial understandings of gun ownership as co-extensive with various political rights (e.g., the right to vote) reinforce this view.  Amar, *supra* at 48.  While many individual liberties were preserved for resident aliens, the right to bear arms was restricted to those who had a special relationship with the United States government. Of course, the requisite relationship with the government has changed over time.  In some cases, it was citizenship.  *See* Blackstone, *supra* at 139–40. In other cases, it was participation in the political process, Amar, *supra* at 48, or willingness to swear allegiance to the sovereign, *see, e.g.*, Laws of Virginia ch. 4, 35, 38.  But all these laws reflect the importance governments historically placed on ensuring that those who owned guns within the borders of the sovereign were those who were known to the government and who recognized its authority.

As noted above, for the first one hundred years of the United States, the federal government largely did not create immigrant categories or regulate immigrant admissions.

*See* Pratheepan Gulasekaram, *The Second Amendment's "People" Problem*, 76 Vand. L. Rev. 1437, 1470–71 (2023). Federal control of immigrant admissions did not begin until the late nineteenth century, with laws like the "overtly racist" 1882 Chinese Exclusion Act. *Id.* And the United States did not criminalize unlawful entry until 1929 with the "Undesirable Aliens Act." *Id.* (citing Act of March 4, 1929, Pub. L. No. 70-1018, ch. 690, § 2, 45 Stat. 1551 (codified at 8 U.S.C. § 180)). Thus, the early post-founding laws did not define the necessary relationship with the government based on lawful versus unlawful immigration status. What was well established at the time of the founding and does apply to our analysis is the underlying concept that those who have no formal relationship with the government and who, therefore, cannot be appropriately regulated may be prohibited from possessing guns.

### 1. Historical Analysis Applied Facially to Section 922(g)(5)(A)

A facial challenge to a statute is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Thus, to succeed in his facial challenge, Escobar-Temal must show that there is no set of circumstances under which 18 U.S.C. § 922(g)(5)(A) would be valid. More particularly, he must show that under no set of circumstances would the history and tradition of firearm regulation described above justify the disarmament of individuals unlawfully present in the country. *See Williams*, 113 F.4th at 657. In considering whether the historical use of firearms regulation justifies a current regulation, we look not for a "historical twin," but merely a "historical analogue." *Rahimi*, 602 U.S. at 701 (quoting *Bruen*, 597 U.S. at 30).

The key considerations for identifying a historical analogue under *Bruen* are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." 597 U.S. at 29. To determine whether such consistency exists, the court "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692 (alteration in original) (quoting *Bruen*, 597 U.S. at 29 n.7). Applying this analytical framework will "often involve reasoning by analogy" while focusing on relevant comparative metrics such as "how and why the

regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 28–29. We review Escobar-Temal's facial challenge de novo. *See Tomaszczuk v. Whitaker*, 909 F.3d 159, 164 (6th Cir. 2018).

Escobar-Temal relies heavily on the conclusion in *Williams* that the reason groups of people were categorically disarmed in the colonial period was because they were presumptively dangerous. *See* 113 F.4th at 657. He argues that a tradition of disarming dangerous people cannot justify a regulation disarming unlawfully present individuals in the United States because "unauthorized aliens have not, as a class, given legislators reason to believe that they are any more violent than the general population." Appellant's Br. 27. As this court noted in *Williams*, a legislature cannot simply define a group as dangerous because it wishes to disarm that group. 113 F.4th at 660. Allowing the legislature to do so would be to "allow legislatures to define away a fundamental right." *Id.* Thus, Escobar-Temal contends, "legislators can disarm a group of persons only if that group has, through its past conduct, demonstrated a propensity for violence." Appellant's Br. 29.

On this interpretation of *Williams*, Escobar-Temal has a strong argument. He cites several studies demonstrating that unlawfully present immigrants are not inherently violent. Natural-born citizens are, at least in some geographic areas, over two times as likely to be arrested for violent crimes, two and a half times more likely to be arrested for drug crimes, and over four times more likely to be arrested for property crimes. Michael T. Light et al., *Comparing Crime Rates Between Undocumented Immigrants, Legal Immigrants, and Native-Born US Citizens in Texas*, 117 Proc. Nat'l Acad. Scis. 32340 (2020). Indeed, the Seventh Circuit has expressly rejected the idea that unlawfully present immigrants are inherently dangerous in a way that would justify their disarmament, noting that the Government provided "no data to support that assertion" and that unlawful presence alone is not criminal and, therefore, does not prove a propensity for criminality. *United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015). If the Government needed to demonstrate that unlawfully present individuals were an inherently violent group, it would have a hard time doing so.

But Escobar-Temal misinterprets this court's precedent. As discussed above, reasons other than inherent violence or criminality can make it dangerous for a group to possess firearms.

One of those reasons is a lack of relationship between the government and individuals of a group that make that group difficult or impossible to regulate. And, as discussed above, there is a longstanding tradition of disarming noncitizens for precisely that reason. Thus, the Second Amendment is not violated by a law disarming a group that lacks a formal relationship with the United States government and that is, therefore, difficult to regulate.[8] We now evaluate § 922(g)(5)(A) with that understanding of our Second Amendment precedent.

In the modern context, the federal government has a complex system of firearm regulations, including restrictions on sales to known out-of-state residents, § 922(b)(3); in-person purchase requirements, § 922(c); mandatory background checks, § 922(t); and a plethora of state regulations. The purpose of these regulations is to promote the safety of the populace. S. Rep. No. 90-1501, at 22 (1968). The Senate explained upon the passage of 18 U.S.C. § 922 that

> The principal purposes of this act are to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime in the United States. The ready availability, that is, the ease with which any person can anonymously acquire firearms . . . is a matter of serious national concern.

*Id.*

As several other circuits have noted, well apart from any criminal or violent tendencies, unlawfully present individuals are harder to subject to such a regulatory scheme. Such individuals exist "largely outside the formal system of registration, employment, and identification, are harder to trace and more likely to assume a false identity." *United States v. Huitron-Guizar*, 678 F.3d 1164, 1170 (6th Cir. 2012). "Persons with a strong incentive to use false identification papers will be more difficult to keep tabs on than the general population." *Meza-Rodriguez*, 798 F.3d at 673. And they will have an inherent incentive to evade detection by law enforcement. *Id.* And all of this is true precisely because, while unlawfully present individuals may have strong connections to the national community, their status inherently lacks a relationship with the United States government.

---

[8]Importantly, however, this holding should not be taken as constitutional license for the disarmament of groups who are difficult to regulate for other reasons beyond a lack of relationship with the sovereign or inherent dangerousness. The historical precedent discussed above does not sweep so broadly.

None of this renders any specific unlawfully present individual dangerous, nor does it render the collective group of unlawfully present individuals more prone to violence than their citizen counterparts. Many unlawfully present individuals live law-abiding, upstanding lives and contribute meaningfully to society in the labor force, academia, and their communities, regardless of their naturalization status. But it does indicate that allowing unlawfully present individuals to be armed could be dangerous because such individuals can more easily circumvent important firearm safety laws. That rationale is well founded in the nation's history and tradition of firearms regulation. Thus, 18 U.S.C § 922(g)(5)(A) survives Escobar-Temal's facial challenge.

### 2. Historical Analysis As Applied to Escobar-Temal

There is some dispute over the appropriate standard of review. Constitutional challenges are typically raised de novo, but "when the argument was not raised at the district court 'Sixth Circuit precedent requires application of the plain error standard.'" *United States v. Bacon*, 884 F.3d 605, 610–11 (6th Cir. 2018) (quoting *United States v. Dedman*, 527 F.3d 577, 591 (6th Cir. 2008)). The parties dispute whether Escobar-Temal sufficiently raised an as applied challenge in his motion to dismiss the indictment below. Because Escobar-Temal's challenge fails even on de novo review, we need not resolve this dispute.[9]

Escobar-Temal contends that, even if § 922 is constitutional on its face, it is unconstitutional as applied to him because he is not individually dangerous. He argues that the court should apply the framework established for § 922(g)(1) in *Williams*, which held as follows:

> History shows that governments may use class-based legislation to disarm people it believes are dangerous, so long as members of that class have an opportunity to show they aren't. Through § 922(g)(1), Congress has decided to enact a class-wide disarmament of felons. . . .[T]hat statute is constitutional as it applies to dangerous individuals.

---

[9]The Government also argues that Escobar-Temal has waived his as applied challenge entirely by failing (a) to raise it in the district court and (b) to preserve the issue in his conditional guilty plea. This argument fails because we have explicitly held that, regardless of whether a defendant preserves his appellate rights in his plea agreement and regardless of whether he raised the issue below, a defendant can raise a constitutional challenge to the statute of conviction on appeal. *Bacon*, 884 F.3d at 610 (citing *Class v. United States*, 583 U.S. 174, 178 (2018)).

113 F.4th at 661–62. Extrapolating from this framework, he argues that, even if individuals present in the United States unlawfully are dangerous as a class, members of that class should have the opportunity to prove that they are not dangerous, and that the law is, therefore, unconstitutional as applied to them.

This argument, once again, presumes that an individual must be inherently violent or criminal to be dangerous. This reading is understandable given that criminality and violence were central to the court's reasoning in *Williams* and because the statute at issue there disarmed felons. 113 F.4th at 661–62. But, as discussed above, the justification in the case of § 922(g)(5) is a lack of relationship with the United States government that makes it difficult to safely regulate the conduct of individuals who are unlawfully present and possess a firearm. Unlike the type of inherent dangerousness discussed in *Williams* that can be rebutted through a showing that the individual is not, in fact, dangerous, the lack of relationship with the government is a product of that individual's legal standing. The only way to resolve it would be for the individual to enter into a relationship with the government that established the state's ability to appropriately regulate the individual.

The history described above supports this conception of the relationship with the state as a litmus test that applies even to law-abiding nonviolent individuals. Consider the Pennsylvania Test Acts that disarmed individuals unwilling to take loyalty oaths and provided no exception for individuals who, though they refused to take the oath, were generally non-criminal and nonviolent. *See Pa. Statutes at Large* at 110. The lack of a relationship with the state made even an inherently peaceable man a problem. *See id.* So too here. Escobar-Temal may be an inherently non-violent person. He may not be dangerous. But his lack of relationship with the government as an unlawfully present individual renders it reasonable for the government to disarm him in the same way that, in 1777, it could disarm a peaceable Quaker or loyalist. Therefore, § 922(g)(5)(A) is constitutional as applied to Escobar-Temal.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

---

**CONCURRENCE / DISSENT**

---

THAPAR, J., dissenting in part and concurring in the judgment. It's no accident that the Constitution starts with "We, the People." Those three words encapsulate the radical idea that has propelled the American experiment for over two centuries: popular sovereignty. The founding generation understood that legitimate government derives its authority from the consent of the governed. The opening words of the Constitution ensure no one can ignore that revolutionary proposition.

This principle now faces a direct challenge: An illegal alien asserts the Second Amendment "right of the people" to bear arms, arguing that constitutional guarantees attach to noncitizens who have developed a personal connection to this country. Properly read, our text, history, and tradition squarely foreclose his claim. They reveal that "the people" refers to the citizens of the United States who consented to its government. Since illegal aliens are not citizens, they cannot lay claim to the right to bear arms reserved for "We, the People."

I. Background

Milder Escobar-Temal is a Guatemalan citizen who illegally entered the United States over a decade ago. In 2022, officers discovered three firearms in Escobar-Temal's home while investigating his alleged sexual abuse of his 14-year-old stepdaughter. The federal government charged him with possession of a firearm as an illegal alien in violation of 18 U.S.C. § 922(g)(5)(A). Escobar-Temal moved to dismiss the indictment, arguing that § 922(g)(5)(A) violates the Second Amendment. The district court denied his motion. After pleading guilty, Escobar-Temal appealed.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. When evaluating whether a law complies with this text, courts apply a two-step process. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). We first ask whether the "plain text" of the Second Amendment as understood at the time of the founding

"covers an individual's conduct." *Id.* If it does, we then examine whether the government has demonstrated that its challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.* Put simply, Step 1 determines whether the Amendment applies, and Step 2 determines the scope of the Amendment's protections.

Both steps require historical analysis. That's because "[t]he very text of the Second Amendment implicitly recognizes the pre-existence of the right [to bear arms]" and "declares only that it 'shall not be infringed.'" *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Thus, courts look to the original public meaning of "the people" at *Bruen*'s Step 1, while they examine the scope of "the right . . . to keep and bear arms" at the founding at Step 2.

This case begins and ends at Step 1. Plain and simple, "the people" refers to the American citizens who consented to the government of the United States. Since illegal aliens aren't citizens, they can't assert "the right of the people to keep and bear arms." And our historical traditions, constitutional text, and Supreme Court precedent confirm this.

## II. History

History resolves this case at *Bruen*'s first step: Illegal aliens are not part of "the people" with Second Amendment rights. From Blackstone to the Federalist Papers to state constitutions, historical evidence reveals that the founders used the term "the people" to refer to citizens.

## A. England

Start where the right to bear arms first took shape. The framers derived the Second Amendment's guarantee from the traditional English right to bear arms. *See id.* In England, that right belonged only to "subjects," not "aliens." When the founders translated the British right into an American one, they retained the British division between rightsholders and foreigners.

The English right to bear arms was restricted from its inception. Between the Restoration and Glorious Revolution, the Stuart monarchs used targeted disarmaments to suppress political dissent. *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 103–06 (1994). The English Declaration of Rights stopped this practice. It mandated that "the *Subjects* which are Protestants may have Arms for their Defence suitable to their

Conditions, and as allowed by Law." 1 W. & M. Sess. 2 c. 2 (Eng.) (emphasis added). This text "has long been understood to be the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593 (first citing Edward Dumbauld, *The Bill of Rights and What It Means Today* 51 (1957); and then citing William Rawle, *A View of the Constitution of the United States of America* 122 (1825)).

The right to bear arms became a birthright of British subjects. *See id.* at 594. As Blackstone explained, "natural-born subjects hav[e] a great variety of rights, which they acquire by being born within the king's ligeance, and can never forfeit." 1 William Blackstone, *Commentaries* *371. Among those "right[s] of the subject" was the right to bear "arms for their defence." *Id.* at *143. Citing these passages in his influential early American edition of Blackstone's *Commentaries*, St. George Tucker noted that gun ownership remained a "right of the subject"—a "birth-right to enjoy entire." 1 St. George Tucker, *Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia* 143–44 (Philadelphia, William Young Birch 1803).

Aliens, on the other hand, were not entitled to the rights of subjects. Generally, "[a]liens could not claim the rights and liberties of the English subject, and the government was free to treat them as it pleased." Patrick J. Charles, *The Plenary Power Doctrine and the Constitutionality of Ideological Exclusion: An Historical Perspective*, 15 Tex. Rev. L. & Pol. 61, 72 (2010). As Blackstone explained, the rights of aliens were "much more circumscribed" than those of subjects, in part because the Crown could limit the scope of their privileges upon admission. 1 Blackstone, *supra*, at *371; *id.* at *272. When Blackstone listed the rights extended to aliens, he included only the safe-passage rights afforded under the law of nations, making no mention of the right to bear arms. *Id.* at *259.

The British provided colonial Americans with a rough blueprint for the right to bear arms. Its scope assumed a stark division between "subjects," who could bear arms, and "aliens," who could not.

### B. Colonies

American colonists accepted the British understanding of the right to bear arms. But revolution required new language: When they declared independence, the colonists discarded their identity as the Crown's "subjects" and rechristened themselves as self-governing "citizens." These citizens consented to the authority of the new federal government, which, in turn, recognized their preexisting rights. To match this Enlightenment ideal of consent-based government, the founders borrowed an Enlightenment term to refer to the collective citizenry: "the people." With that new label, "the people"—sovereign American citizens—became traditional rightsholders.

The American understanding of "the people" originates with the Enlightenment. Enlightenment political thinkers envisioned a consent-based alternative to monarchy that depended on the will of "the people." *See generally* John Locke, *Second Treatise of Government* (C.B. McPherson ed., Hackett 1980) (1689); Samuel von Pufendorf, *On the Duty of Man and Citizen* (F.G. Moore trans., Lonang Inst. 2005) (1673); Montesquieu, *The Spirit of Laws* (Thomas Nugent trans., Batoche Books 2001) (1748); Jean-Jacques Rousseau, *The Social Contract* (G.D.H. Cole trans., E.P. Dutton & Co. 1920) (1762). Chief among them, John Locke posited that men could "enter into society to make *one people*, one body politic, under one supreme government." Locke, *supra*, § 89 (emphasis added). Any ruler—even a king—claiming to exercise power separate from the "laws of the community" had "no right to be obeyed" because he was "not the person the people have consented to." *Id.* § 198. Locke's views became a "political gospel" for the founders, providing the "form" and "phraseology" of the Declaration of Independence and the backdrop for the Constitution's three-part division of powers. *See* Carl L. Becker, *The Declaration of Independence: A Study in the History of Political Ideas* 27 (1922); Junius Americanus (Arthur Lee), *Boston Evening Post* (May 4, 1772) ("Representation . . . is Mr. Locke's doctrine, it is the doctrine of reason and truth, and it is . . . the unvarnished doctrine of the Americans.").

Later political thinkers tinkered with Locke's terminology. Montesquieu, for instance, believed political dependence on the monarchy or aristocracy left "the people" in "a state of annihilation," a condition that relegated them to "subjects." Montesquieu, *supra*, at 29–30; *see*

*also id.* at 42. The defining feature of a republic was the "exorbitant power" of the "private citizen," each of whom "ha[d] sufficient ability to choose" the administration of government. *Id.* at 27–28; *see also id.* at 39 n.5 (distinguishing "citizens" from "strangers"). Or take Jean-Jacques Rousseau, the founders' French contemporary. Building on Locke, he explained that "citizen[s] of a free state" are "member[s] of its sovereign" with the "right of voting." Rousseau, *supra*, at 5. To Rousseau, "[t]hose who are associated in [the sovereign] take collectively the name of *people*, and severally are called *citizens*, as sharing in the sovereign power, and *subjects*, as being under the laws of the State." *Id.* at 16. After performing a historical canvass of the term, he concluded that he "ha[d] never read of the title of citizens being given to the subjects of any prince." *Id*. at 15 n.1. Both Montesquieu and Rousseau's theories provide insight into the terminology that the founders understood to denote popular sovereignty and representative government.

The American Revolution operationalized both the ideas and the terminology. On July 4, 1776, "the sovereignty devolved on the people," not the "subjects." *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 471 (1793) (opinion of Jay, C.J.). To reflect that, the framers decided that terms like "the people" and "citizen" were "better suited to the description of one living under a republican government." *Minor v. Happersett*, 88 U.S. 162, 166 (1874); *see also* James Madison, *Who Are the Best Keepers of the People's Liberties*, Nat'l Gazette (Dec. 20, 1792) (mocking anti-republicans as "destitute . . . of every quality of a good citizen, or rather of a good *subject*" (emphasis in original)). And they underscored the significance of this linguistic shift by carefully distinguishing American "citizens" from foreign "subjects." *See, e.g.*, U.S. Const. art. III, § 2 (establishing jurisdiction over controversies "between a State or the citizens thereof and foreign states, citizens or subjects"); Treaty of Paris arts. vii, viii, Gr. Brit.-U.S., Sept. 3, 1783, 8 Stat. 80 (making peace between "subjects of Great Britain and the citizens of the United States"); *see also Chisholm*, 2 U.S. at 471–72 (opinion of Jay, C.J.); *id.* at 431 (opinion of Iredell, J.); *Orr v. Hodgson*, 17 U.S. (4 Wheat.) 453, 464 (1819) (distinguishing "British subjects" from "American citizens").

The Declaration of Independence showcases the founders' new republican terminology. "[T]he People," announced the Declaration, possess "the Right . . . to alter or to abolish" their

government when it becomes "destructive" of the "ends" it is established to advance: securing "Life, Liberty and the pursuit of Happiness." The Declaration of Independence (U.S. 1776). Once it became clear that King George III was "unfit to be the ruler of a free people," *see id.*, the people exercised their "inalienable legal right" to rebel against such tyranny, Akhil Reed Amar, *Philadelphia Revisited: Amending the Constitution Outside Article V*, 55 U. Chi. L. Rev. 1043, 1050 (1988). These references show a close conceptual linkage between "the people" and the citizens who consented to and checked their representative government.

The colonial period gives us the building blocks of the right of "the people" to bear arms: The British rights of "subjects" became the American rights of "citizens," whom the founders collectively referred to as "the people."

## C. Founding

After the Revolution, the framers continued to use "the people" as a term of art to refer to the collective body of citizens. The founding generation understood the right to bear arms—the sword and shield for self-governance—as belonging exclusively to those who had consented to that new government. Put simply, only citizens who consented to be governed could claim the rights necessary to govern themselves.

In general, the founders viewed "the people" as the citizens responsible for legitimating a democratic government. As James Madison explained, since "the people were in fact, the fountain of all power," their participation legitimated both the Constitution they ratified and the laws of the Congress they elected. 2 *The Records of the Federal Convention of 1787*, at 476 (M. Farrand ed., 1911) [hereinafter *Farrand's Records*]; James Madison, *Notes on a Speech to Congress* (1787) ("[I]n Elective Govt., all power in people."). It was therefore imperative, as John Adams recognized, that any democratic assembly must be "an exact Portrait, in Miniature, of the People at large" to ensure it represents "equal Interests among the People." 3 John Adams, *The Adams Papers* 80 (Robert J. Taylor ed., 1979); *see also* 5 Alexander Hamilton, *The Papers of Alexander Hamilton* 36 (Harold C. Syrett ed., 1962). For "the people," explained Thomas Jefferson, "will not acknowledge as laws any acts not considered and assented to by the major part of their delegates." Thomas Jefferson, *Notes on the State of Virginia* 131

(Boston, Lilly & Wait 1832). The founders consistently viewed participation in democratic governance as limited to American citizens, whom they referred to collectively as "the people."

To limit "the people" who engaged in self-government, the founders sharply distinguished between American citizens and "aliens," who were subjects of foreign sovereigns. The clearest articulation of this view appeared in George Washington's Farewell Address, jointly authored by Washington, James Madison, and Alexander Hamilton. The Address started from the premise that "[t]he basis of our political systems is the right of the people to make and to alter their constitutions of government." George Washington, *Farewell Address* 11 (U.S. Senate Hist. Off. 2017) (1796). "[U]ntil changed by an explicit and authentic act of the whole people," the Address continued, that Constitution was "sacredly obligatory upon all." *Id.* But constitutional government—a "blessing" of "a free people"—faced external threat from "the insidious wiles of foreign influence." *Id.* at 4, 20. The "great rule of conduct" for the young republic was "hav[ing] with [foreign nations] as little *political* connection as possible," precisely because their "influence [wa]s one of the most baneful foes of republican government." *Id.* at 20–21. Only "[i]f we remain one people" could we hope to "defy material injury from external [i.e., foreign] annoyance." *Id.* at 21–22. As the Address underscored, the founders believed democratic governance necessitated a strict division between citizens and aliens. Far from entitling aliens to constitutional rights, foreign "political connection[s]" posed a grave threat to the security and stability of "the people."

Thomas Jefferson shared his predecessor's views. Like Washington, Jefferson worried that "civil government" based on the "freest principles" could not persist in a state that permitted foreigners to arrive and immediately gain "all the rights of citizenship." Jefferson, *supra*, at 91. He therefore insisted on a strict distinction between citizens and aliens: "A foreigner" did not "acquir[e] every right of a native citizen" until he was naturalized, the culmination of a formal process that required both residency and an oath of allegiance. *Id.* at 90–91, 140; *see also id.* at 143. Before then, Jefferson stressed that aliens were barred from conveying property, bringing suits for money damages in courts, and engaging in the political process. *Id.* at 162–63. Consequently, as he observed, one of the primary political priorities of certain state governments, including Virginia's, was "defin[ing] with precision the rules whereby aliens should become

citizens." *Id.* at 143. To preserve democratic government, Jefferson advocated for a rigid division between "citizens," who had civic and political rights, and "aliens," who did not.

The Federalist Papers employed similar vocabulary to link "the people" to consent-based government. As the dedication page announces, the Federalist Papers were written "To the People of the state of New-York." The Federalist No. 1, at 1 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The intended audience, then, was "the People" who would ultimately vote for or against the Constitution. This usage didn't stop at the front matter. Madison, for example, wrote in Federalist No. 46 that "[t]he federal and State governments are in fact but different agents and trustees of the people." The Federalist No. 46, at 294 (James Madison). And in Federalist No. 57, he emphasized "the right and the capacity of the people to choose their own rulers." The Federalist No. 57, at 353 (James Madison). Not to be outdone, Hamilton echoed Madison's word choice in Federalist No. 22, arguing that "[t]he fabric of American empire ought to rest on the solid basis of THE CONSENT OF THE PEOPLE . . . that pure, original fountain of all legitimate authority." The Federalist No. 22, at 152 (Alexander Hamilton) (emphasis in original). So Madison and Hamilton, like their contemporaries, believed "the people" were the citizens who consented to their government, not foreigners without a say in the process.

The Anti-Federalists disagreed with the Federalists about ideas—but not terminology. Federal Farmer, for instance, noted the distinction between the ability of "citizens and foreigners, states and foreigners" to sue the federal and state governments. Letters from the Federal Farmer, No. 3 (Oct. 10, 1787), *reprinted in* Bernard Bailyn, *The Debate on the Constitution* 273 (1993). This distinction made sense because in the "judicial and executive departments . . . , the body of the people possess a large share of power and influence, as jurors and subordinate officers." Letter from a Federal Farmer, No. 11 (Jan. 10, 1788), *reprinted in* 2 *The Complete Anti-Federalist* 291 (Herbert J. Storing ed., 1981). By the same token, dissenters at the ratifying conventions used similar language to critique the new government for allowing officeholders to be insufficiently responsive "to the people" who had elected them. The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to Their Constituents (Dec. 18, 1787), *reprinted in The Anti-Federalist* 219 (Herbert J. Storing ed., Murray Dry abr., 1985). Like the

Federalists, the Anti-Federalists used "the people" to refer to the American citizens who established and supervised the federal government.

The Federalists and Anti-Federalists also agreed that only citizens possessed the right to bear arms. The defenders of the federal Constitution fiercely safeguarded this right of the people. As Elbridge Gerry warned at the Philadelphia Convention, letting the "Citizens . . . be disarmed" "would be regarded as a system of Despotism." 2 *Farrand's Records*, *supra*, at 385. Another Pennsylvania Federalist, Tench Coxe, echoed this sentiment, boasting that the "[t]he powers of the sword" lay "in the hands of the people" because it was the "birth-right" of "the yeomanry of America." 33 *Ratification of the Constitution by the States, Pennsylvania Supplemental Documents* 909, 911–12 (John P. Kaminski, et. al. eds., 2019). And John Adams called simply for "arms in the hands of citizens" for "private self-defence." 3 John Adams, *A Defense of the Constitutions of the Government of United States of America* 475 (London, C. Dilly 1788).

The authors of the Federalist Papers seconded this message. As Hamilton warned, "[i]f the representatives of the people betray their constituents, there is then no resource left but in the exertion of that original right of self-defense." The Federalist No. 28, at 180 (Alexander Hamilton). To Hamilton, the right to self-defense belonged to the constituents of the government—that is, the "citizens" who could "rush . . . to arms." *Id.* Echoing this sentiment, Madison predicted that, if a standing army ever became oppressive, "[t]o these would be opposed a militia amounting to near half a million of citizens with arms in their hands." The Federalist No. 46, at 299 (James Madison). This "advantage of being armed," Madison continued, was an asset which "Americans possess over the people of almost every other nation." *Id.* The Federalists' language limited the right to bear arms to the citizens that legitimated a democratic government—not aliens.

Despite this rhetoric, Anti-Federalists often criticized the absence of a right to bear arms in the Constitution. One writer, for example, worried that "a citizen may be deprived of the privilege of keeping arms for his own defense" under the proposed Constitution. David T. Hardy, *Armed Citizens, Citizen Armies: Toward a Jurisprudence of the Second Amendment*, 9 Harv. J.L. & Pub. Pol'y 559, 602 & n.213 (1986). At the Massachusetts ratifying convention,

disgruntled delegates proposed an amendment that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." *Debates and Proceedings in the Convention of the Commonwealth of Massachusetts* 86 (Charles Hale et al. eds., Boston, William White 1856). Likewise, New Hampshire's delegates demanded a guarantee that "Congress shall never disarm any citizen except such as are or have been in actual rebellion." Joseph Burbeen Walker, *Birth of the Federal Constitution* 51 (Boston, Cupples & Hurd 1888). The draft language revealed "how leaders and laymen alike thought about the proposed government." *United States v. Williams*, 113 F.4th 637, 655 (6th Cir. 2024). And these precursors to the Second Amendment suggest "leaders and laymen" saw the right to bear arms as limited to "citizens."

## D. States

The debate over the federal Constitution influenced similar debates occurring at the state level. Early state constitutions and state-court cases provide "strong evidence" that the founding generation understood the Second Amendment to cover only American citizens. *Heller*, 554 U.S. at 603.

Contemporary state constitutions often used "the people" to refer to the citizens who established, altered, and elected their state governments. That practice reflected the fact that, in general, "the Constitution of a particular State may be altered [only] by a majority of the people of the State." 2 *Farrand's Records*, *supra*, at 92 (Statement of Gouverneur Morris). The Vermont Constitution of 1777, for instance, stated in its preamble that the government was "instituted . . . for the security and protection of the community . . . to enable the individuals who compose it[] to enjoy their natural rights . . . and whenever those great ends of government are not obtained, the people have a right, by common consent, to change it." Vt. Const. of 1777 pmbl.; *see also* Va. Declaration of Rts. § III (1776) (similar). Or, as Massachusetts put it, since "[a]ll power reside[s] originally in the people," "the people alone have an incontestable, unalienable, and indefeasible right to institute government; and to reform, alter, or totally change the same." Mass. Declaration of Rts. of 1780, arts. V, VII; *see also* N.C. Const. of 1776, art. I (similar). By the same token, the Maryland Constitution restricted the right to ratify or amend the constitution to the state's citizens, noting that "all government of right originates from the

people, is founded in compact only, and instituted solely for the good of the whole." Md. Const. of 1776, art. I. The notion that only "the people" could reorganize their "community" into a government once again linked the term to the citizens who exercised popular sovereignty.

State constitutions reflected this understanding by using the terms "the people" and "citizens" interchangeably. Numerous state constitutions limited the right to bear arms to "citizens" or "the people." *Compare, e.g.*, Mass. Const. of 1780, pt. 1, art. 17; Pa. Declaration of Rts. of 1776, cl. XIII; Ohio Const. of 1802, art. VIII, § 20; R.I. Const. of 1842, art. I, § 22; Vt. Const. of 1777, ch. I, art. XV (using "people"), *with* Pa. Const. of 1790, art. IX, § 21; Ky. Const. of 1792, art. XII, § 23; Miss. Const. of 1817, art. I, § 23; Conn. Const. of 1818, art. 1, § 17; Ala. Const. of 1819, art. I, § 23; Me. Const. of 1819, art. I, § 16; Repub. Tex. Const. of 1836, Declaration of Rights, cl. 14 (using "citizens"). Before the Civil War, only one state, Michigan, gave "[e]very person" the right to bear arms. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 198 (2006) (collecting early state constitutions). Michigan's unique word choice suggests that the popular terms "citizens" and "the people" did not extend to all individuals present within a state.

Early courts likewise understood "the people" as American citizens. As the Massachusetts high court explained, "the people, in making the constitution, intended that the supreme power of legislation should not be delegated, but by citizens." *In re Opinion of Justs.*, 7 Mass. 523, 525 (1811). Absent a clear statement from "the people," political rights are automatically "restrained to such inhabitants and residents as are *citizens.*" *Id.* Applying this reasoning, early courts naturally viewed the right to bear arms as attaching only to Americans. *See Aymette v. State*, 21 Tenn. (2 Hum.) 154, 160 (1840) ("The citizens have the unqualified right to keep the weapon."); *United States v. Sheldon*, 5 Blume Sup. Ct. Trans. 337, 346, 1829 WL 3021 (Mich. 1829) ("The constitution of the United States also grants to the citizen the right to keep and bear arms."). More generally, courts extended this reasoning to distinguish between the common-law rights of "alien[s]" and "the people of [a] State." *Marshall v. Lovelass*, 1 N.C. 412, 441–42 (Super. L. & Eq. 1801); *see generally Jackson ex dem. Gansevoort v. Lunn*, 3 Johns. Cas. 109 (N.Y. Sup. Ct. 1802); *Johnson v. Hart*, 3 Johns. Cas. 322 (N.Y. Sup. Ct. 1802). Rightsholders needed to be American citizens, plain and simple.

Linguistic evidence confirms that state and federal usage of "the people" was representative of early Americans. In a database collecting 138 million words from over 127,000 founding-era texts, "the people" is positively correlated with terms relating to representative government, like "citizen(s)" and "American(s)." *See* Corpus of Founding Era American English, BYU L. Corpus Linguistics, http://lawcorpus.byu.edu/cofea.[1] It displays a similar relationship with terms that describe popular sovereignty, like "political," "community," and "sovereignty." Most significantly, it bears a much weaker relationship to terms related to nonparticipants in the political community, like "alien(s)" or "foreigner(s)." The analysis suggests that average Americans understood "the people" as connected to American citizenship.

## E. The Majority's Response

How does the majority get around this avalanche of historical sources excluding illegal aliens from the right to bear arms? It doesn't. On its read, the "litany of historical sources" that "historically excluded" noncitizens from bearing arms are not "useful . . . at this stage" for determining whether illegal aliens have Second Amendment rights. Maj. Op. at 8; *see also id.* (finding "current precedent does not compel a historical analysis of how 'the people' was understood at the time of the founding").

To reach this conclusion, the majority cites then-Judge Barrett's "conceptual point" that, at Step 1, courts should generally exclude "weapons or activities" instead of "people" from the Second Amendment's protections. *Kanter v. Barr*, 919 F.3d 437, 451–52 (7th Cir. 2019) (Barrett, J., dissenting); *see also* Maj. Op. at 8; *Williams*, 113 F.4th at 649–50 (applying this method). But Justice Barrett didn't say that lower courts can abandon the threshold inquiry or disregard historical evidence when performing Step 1. Rather, her point was pragmatic:

---

[1]Our circuit has embraced corpus-linguistics analysis as a "helpful tool in assessing common usage." *Fulkerson v. Unum Life Ins. Co. of Am.*, 36 F.4th 678, 682 (6th Cir. 2022); *see also Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 439–40 (6th Cir. 2019) (Thapar, J., concurring in part and in the judgment). This analysis provides quantitative support for the general claim that "the people" and "political community" are closely related concepts. If the term "the people" appears in a text, there is a 23% chance the surrounding twelve words contain the term "political," an 18% chance of "citizens," and a 10% chance of "community." Each correlate has an observed frequency between 30 and 60 standard deviations above the mean. By contrast, "the people" is negatively related or unrelated to terms referring to nonparticipants in the political community. Put numerically, if "the people" appears in a text, there is under a 2% chance that the term "foreigner(s)" or "alien(s)" appears in the surrounding dozen words.

If courts default to excluding individuals based on subjective and shifting statuses—like addiction, *see* 18 U.S.C. § 922(g)(3), or mental illness, *see id.* § 922(g)(4)—"a person could be in ['the people'] one day and out the next," *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). This thoughtful concern doesn't apply when dealing with disarmaments based on an objective characteristic, like immigration status. *See Rehaif v. United States*, 588 U.S. 225, 227 (2019). When our historical tradition supports the exclusion of an objectively identifiable group, courts can and should make this determination at Step 1.

Though the majority doesn't consider history "useful . . . at this stage," it still offers three historical tangents. Maj. Op. at 8.

*First*, the majority observes that there wasn't an immigration process at the founding, so all noncitizens were legally present. *Id.* at 9. But that's beside the point. The founding-era history distinguishes between the rights of citizens and aliens, not the rights of aliens and illegal aliens. Until aliens took the oath of citizenship, they owed only "temporary obedience" to the "laws" of the United States. *Id*. at 10 (quoting Elliot, *supra*, at 556). Their "temporary" status entitled them to the basic "protection[s]" and even "advantage[s]" afforded to any person within a sovereign's jurisdiction, like safe-passage guarantees and economic privileges. Elliot, *supra*, at 556. But "because aliens are not parties to the Constitution, as citizens are parties to it, . . . they have no right to its protection." *Id.*; *see also* 1 Blackstone, *supra*, at *366. Though the founders believed aliens enjoyed basic legal protections, aliens couldn't assert the constitutional rights reserved for citizens.

*Second*, the majority argues that noncitizens enjoy constitutional rights because some aliens could vote in state and local elections at the founding. Maj. Op. at 10–11. But "the people" doesn't refer to voters; it refers to citizens. The federal Constitution's uniform references to "the people" cannot be pegged to local voting laws, which varied by time and place. So the ability to vote in colonial, state, and local elections can't inform the meaning of "the people" in the federal Constitution. If extended to its logical conclusion, the majority's argument suggests that the Constitution entitles anyone who can vote locally to vote federally. But if that were the case, the longstanding law limiting the federal franchise to citizens would be unconstitutional. 18 U.S.C. § 611(a). Even the majority doesn't go that far.

*Third*, the majority asserts that founding-era dictionaries state that "the people" refers to persons "compos[ing] a community, town, city, or nation." Maj. Op. at 10 (citation modified). For starters, the majority's dictionaries define the generic collective noun "people" instead of the constitutional term of art "*the* people." Since the dictionaries aren't defining the term of art, they include a slew of definitions that are clearly irrelevant, ranging from "people" meaning "gentiles" to "the mass of illiterate persons." Noah Webster, *American Dictionary of the English Language* 600 (1st ed. New York, S. Converse 1828); 2 Samuel Johnson, *A Dictionary of the English Language* 305 (6th ed. London, J.F. & C. Rivington 1785). The majority's cherry-picked definitions underscore that words need context to have meaning. *Compare* Maj. Op. at 10, *with supra* note 1 (defining "the people" based on 127,000 founding-era texts). Indeed, the definitions are so inapposite that even the majority refuses to use them. Under the majority's test, Escobar-Temal needs "substantial connections" to the United States to assert constitutional rights. Maj. Op. at 6. That's a far cry from the "mere presence" in a community or town the majority's dictionaries suggest.

None of the majority's arguments rebuts the weight of the historical record demonstrating that "the people" was a term of art for citizens.

\* \* \*

Our historical traditions don't just support the exclusion of illegal aliens—they demand it. Justice Story puts it best: "[T]he right of the citizens to keep and bear arms has justly been considered as the palladium of the liberties of a republic, since it offers a strong moral check against the usurpation and arbitrary power of rulers." 2 Joseph Story, *Commentaries on the Constitution of the United States* 620–21 (4th ed. Boston, Little, Brown & Co. 1873). Whether belonging to the "yeomanry of America," the "birth-right of an American," or "in the hands of the people," the Second Amendment enshrined a right for American citizens. This group of rightsholders excludes illegal aliens, who do not enjoy the privileges or bear the responsibilities of American citizenship. They therefore cannot be part of "the people" covered by the Second Amendment—and our historical traditions couldn't make this any clearer.

III.  Text

The Constitution's text incorporates the historical understanding of "the people."  All seven "provisions of the Constitution that mention 'the people'" use the term "unambiguously" to refer to American citizens.  *Heller*, 554 U.S. at 580.  This intratextual connection provides "a surface sign of a much deeper thematic connection."  Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747, 793 (1999).

A.  Structural References

The references to "the people" throughout the structural provisions of the Constitution and Bill of Rights uniformly point to American citizens.

The Preamble announces that "We, the People of the United States, . . . do ordain and establish this Constitution."  U.S. Const. pmbl.  The striking phrase prompted Patrick Henry, a representative at the Virginia ratifying convention, to voice a "political curiosity":  "'*We, the People*'? . . . Who authorized [the drafters] to speak the language of '*We, the People*,' instead of '*We, the States*'?"  3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787*, at 22–23 (Jonathan Elliot ed., New York, Burt Franklin 1888).  His rhetorical question found no shortage of answers:  James Wilson, the Preamble's drafter, explained that the government was "founded upon the power of the people," so the phrase reflected that it was constituted in "their name and their authority."  Bernard Bailyn, *The Debate on the Constitution* 836 (1993).  Others clarified that "the People" referred more generally to those who "appoint . . . to public offices" and "choose such characters" embarking on the "business of civil government": that of "protect[ing] the citizen in his rights" and "defend[ing] the community from hostile powers."  *Id.* at 524.  The heated discussion over the Preamble demonstrates a uniform understanding that the phrase referred to citizens with ratification and federal electoral authority.

The Bill of Rights expands on this theme.  The Ninth Amendment provides that the "enumeration in the Constitution of certain rights shall not be construed to deny or disparage

others retained by *the people*." U.S. Const. amend. IX (emphasis added).**2** This provision stressed that the individuals who ratified the Constitution—"We, the People"—did not give up other rights by doing so. As Madison explained, the Ninth Amendment countered the objection that "those rights which were not singled out, were intended to be assigned into the hands of the General Government, and were consequently insecure." 1 *Annals of Congress: The Debates and Proceedings in the Congress of the United States* 439 (Washington, D.C., Gales & Seaton 1834). Because the Ninth Amendment applied to the ratifiers of the federal Constitution, its use of "the people" specifies that the term refers to those individuals who ordained and established the Constitution—namely, citizens.

So too with the Tenth Amendment. That provision reserves "[t]he powers not delegated" to the federal government "to the states . . . or to the people." U.S. Const. amend. X. Again, "the people" referred to citizens who wield political power—those who sat down to ratify the Constitution. Justice Joseph Story emphasized the link between the Preamble and the Tenth Amendment, declaring the country was "ordained and established . . . emphatically, as the preamble of the constitution declares, by 'the people of the United States.'" *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 324 (1816). This notion of "the people" as the source of authority, Justice Story continued, was "positively recognised by one of the articles in amendment of the constitution," which asserts that the powers not delegated to the federal government are reserved to the states "or *to the people*." *Id.* at 325 (emphasis in original). As Justice Story made clear, "the people" means the same thing throughout the Constitution—the unified group of citizens from which the government derives its power.

Alexander Hamilton also connected the Preamble and the proposed Tenth Amendment when he argued against including a bill of rights. Citing the Preamble, Hamilton explained that a bill of rights was unnecessary because "the people surrender nothing" and "retain everything." The Federalist No. 84, at 513 (Alexander Hamilton). Thus, to Hamilton, a bill of rights was a

---

**2**The majority insists that the Ninth and Tenth Amendments are "distinguishable because they refer to 'the people' in a context other than the rights of the people." Maj. Op. at 5 n.2 (citing *Heller*, 554 U.S. at 579). True, the Ninth and Tenth Amendments refer to different types of rights than the First, Second, and Fourth Amendments. But all seven references to "the people" in the Constitution "unambiguously" refer to the same group. *Heller*, 554 U.S. at 581. Since this case requires us to analyze the meaning of "the people" but not the scope of the Second Amendment "right," these provisions are not "distinguishable."

superfluous addition to a constitution in which "the people" enumerated specific governmental powers and left all other powers to the states and themselves.

The Constitution's references to "the people" across articles and amendments are difficult to reconcile with any understanding that treats illegal aliens as part of "the people." After all, illegal aliens did not ratify the Constitution. Nor do they elect members of the House and Senate. Because they are not sovereign citizens who consented to the Constitution and oversee the government, they do not retain those rights not delegated to the federal government.

### B. Amendments I & IV

The majority barely mentions the five references to "the People" in the Preamble, Article I, and the Ninth and Tenth Amendments. Instead, it focuses exclusively on the uses of "the people" in the First and Fourth Amendments, which "guide [the Court's] interpretation of the same phrase in the Second Amendment." Maj. Op. at 5. Setting aside that neither constitutional text nor history supports the majority, the uses of "the people" in the First and Fourth Amendments are not so clear-cut. Originally understood, neither the First nor Fourth Amendment clearly extends to noncitizens. And, properly read, the Supreme Court's guidance on these Amendments is far from consistent, in part due to the drift of First and Fourth Amendment caselaw from the original public meaning of the text.

*The First Amendment.* The First Amendment prohibits Congress from making laws "respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. Neither history nor precedent indicates that the First Amendment definitively applies to aliens.

Most clearly, the "right of the people peaceably to assemble, and to petition the Government for a redress of grievances" is restricted to American citizens. *Id.* From England to present, these prerogatives have run together as a single compound political right that enables citizens "to meet peaceably for consultation in respect to public affairs," then "petition for a redress of grievances" identified at that assembly. *United States v. Cruikshank*, 92 U.S. 542, 552 (1875); 2 Blackstone, *supra*, at *146–47 (describing petition and assembly as "[n]early related").

At present, both caselaw and congressional practice arguably restrict the right to petition and assemble to Americans. *See Cruikshank*, 92 U.S. at 552 ("The right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances . . . is an attribute of national citizenship."); *Heller*, 554 U.S. at 595 (referring to the First Amendment "right of citizens to speak"); Senate Standing Rules art. V (2013) (limiting "petition[s] . . . signed by citizens or subjects of a foreign power").

Like the right to bear arms, the founders inherited the right to petition and assemble from the English legal tradition. *See* Magna Carta art. 61 (1215) (allowing English barons to assemble to "declare" a violation of their rights and "claim immediate redress"); Declaration of Rights, 1 W. & M. Sess. 2 c. 2 (Eng.) (safeguarding a "right to petition" the Crown). And, like the right to bear arms, this right was restricted to "the subjects of England," whose status "entitled" them to petition the government "to vindicate" their liberties. 1 Blackstone, *supra*, at *144 (citing the Declaration of Rights). By the American Revolution, the right of petition and assembly was considered a traditional prerogative of English subjects.

The compound right of assembly and petition was critical to the American Revolution. At the First Continental Congress, the colonists explicitly invoked their "right peaceably to assemble, consider of their grievances, and petition the king." Declaration & Resolves of the First Continental Congress, Res. N.C.D. 8 (Oct. 14, 1774). When King George failed to address their "repeated Petitions," they responded by declaring independence. The Declaration of Independence (U.S. 1776) ("Our repeated Petitions have been answered only by repeated injury."). Shortly thereafter, the newly independent states codified the English and colonial right in their constitutions, describing the compound right of petition and assembly as a political right of the "citizens" or "the people."[3] By the founding, American commentators viewed the right to assemble and petition as a storied American "birth-right" that was "consonant with the nature of our representative democracy." Tucker, *supra*, at 144, 299; *see also* 1 William Blackstone, *Commentaries* 125 n.3 (Sharswood et al. ed., J.B. Lippincott Co. 1893). The dual right to

---

[3]*Compare*, *e.g.*, Vt. Const. of 1777, ch. I, § 28; Mass. Const. of 1780, art. 29; Pa. Declaration of Rts. of 1776, cl. XVI; Ohio Const. of 1802, art. VIII, § 19; Me. Const. of 1819, art. I, § 15 ("the people"), *with* R.I. Const. of 1842, § 21; Ky. Const. of 1792, art. XII, § 22; Miss Const. of 1817, art. I, § 22; Conn. Const. of 1818, art. 1, § 16; Ala. Const. of 1819, art. I, § 22 ("citizens").

assemble and petition thus became the quintessential right of American citizens who participated in the political community. After all, what could be more critical to representative government than the ability to petition one's representatives?

Aside from the right to assemble and petition, the First Amendment's application to noncitizens was far from settled at the time of the founding. One episode is particularly instructive: President John Adams contemplated applying the Alien and Sedition Acts to imprison William Duane, the editor-in-chief of a newspaper issuing an "uninterrupted stream of slander" about the Adams Administration. Letter from Timothy Pickering to John Adams (July 24, 1799). Instead of asserting the First Amendment directly, Duane claimed—perhaps falsely—to be an American citizen. *Id.* Of course, that would be no defense if the First Amendment protected citizens and aliens alike. *See* Senate Contempt of Congress Charges (1800), Nat'l Archives, <https://perma.cc/LZ2U-P84X>. As one Virginia representative explained, the use of "the people" in the First Amendment's text likely meant that those rights were restricted to "citizens," while the Amendments that used general terms, like "person," were not. *The Virginia Report of 1799-1800*, at 91–92 (Richmond, J.W. Randolph 1850) (statement of Mr. Daniel); *see also* Oliver Ellsworth, Reply to Elbridge Gerry (Nov. 20, 1787) ("[Even] the meanest citizen hath a right to speak."); Oliver Ellsworth, *A Landholder, No. VII*, *reprinted in* Bailyn, *supra*, at 522 ("If he be a good and peaceable citizen, . . . on account of his religious sentiments . . . he is not subject to persecution."). The application of the Alien and Sedition Acts to resident foreigners suggests that the founders did not understand the First Amendment to extend to aliens, much less illegally present ones.

The majority errs in assuming that modern caselaw guarantees First Amendment rights to noncitizens, let alone illegal aliens. The Supreme Court has consistently found that noncitizens may assert speech protections in more limited circumstances than American citizens. *See, e.g.*, *Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 491–92 (1999) (upholding deportation of members of a pro-Palestine "organization that supports terrorist activity"); *Galvan v. Press*, 347 U.S. 522, 529 (1954) (permitting deportation of noncitizens because they were communists); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952) (same); *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904) (upholding a law providing for "the exclusion of

an alien because he is an[] anarchist"). By rejecting valid First Amendment defenses, the Court has consistently implied that aliens do not enjoy the First Amendment's protections, especially if they are illegally present. As Justice Scalia summarized this "general rule," "[w]hen an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the additional reason that it believes him to be" engaged in unwanted political expression. *AADC*, 525 U.S. at 491–92. Similarly, a corporation's foreign status affects its ability to assert First Amendment protections. *Cf.* Transcript of Oral Argument at 35, *TikTok Inc. v. Garland*, 145 S. Ct. 57 (2025) (No. 24-656) ("[T]he law is only targeted at this foreign corporation, which doesn't have First Amendment rights."); *Moody v. NetChoice, LLC*, 603 U.S. 707, 747 (2024) (Barrett, J., concurring) ("[F]oreign ownership and control . . . might affect whether laws . . . trigger First Amendment scrutiny.").

Following the Court's lead, lower courts often entertain restrictions on noncitizens' speech, expression, and assembly that they might find impermissible for American citizens. *See, e.g.*, *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 282 (D.D.C. 2011) (Kavanaugh, J.) ("[T]he government . . . may exclude foreign citizens from activities that are part of democratic self-government in the United States."), *aff'd*, 565 U.S. 1104 (2012); *United States v. Singh*, 979 F.3d 697, 710 (9th Cir. 2020) (upholding campaign-finance law that "regulates only foreign nationals, which is within the ambit of Congress's broad power to . . . condition immigration"). Our circuit is no different. *See OPAWL v. Yost*, 118 F.4th 770, 777 (6th Cir. 2024) ("The Supreme Court has repeatedly instructed that states have significant leeway in protecting their democratic processes from the influence of noncitizens."); *OPAWL v. Yost*, 152 F.4th 736, 742 (6th Cir. 2025) (Kethledge and Murphy, JJ., concurring).

All told, these carve-outs and ambiguities suggest that our courts recognize that the First Amendment does not attach with equal force to citizens and noncitizens.

*The Fourth Amendment*. The Fourth Amendment is more complicated still. It guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Like the First and Second

Amendments, the founders inherited this right from the British and excluded illegal aliens from its guarantees.

The Fourth Amendment codified a preexisting right of "Englishmen" and "subjects" against search, seizure, and arrest. William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning, 602–1791*, at 442–59 (2009) (collecting cases and sources). Due to high-profile searches of English dissidents, the British legal understanding of search and seizure became "well known to the men who wrote and ratified the Bill of Rights, [and] famous throughout the colonial population." *Carpenter v. United States*, 585 U.S. 296, 391 (2019) (Gorsuch, J., dissenting) (quotation omitted). The clearest evidence that the founders viewed their right against search and seizure as a traditional English one comes from state constitutions, which often copied verbatim the text of the Magna Carta and borrowed the British terminology of "subjects." *See, e.g.*, Vt. Const. of 1777, ch. 1, § XI (acknowledging that Vermont "subjects" had a "right" to be "free from search and seizure"); Md. Const. of 1776, arts. XXI, XXIII (copying Article 39 of the Magna Carta and outlawing general warrants).[4] Though the Fourth Amendment deliberately secured and specified British subjects' common-law rights, history does not suggest that the founders intended to expand its coverage to noncitizens.

Even now, the Supreme Court has never confirmed that the Fourth Amendment covers aliens, much less illegally present ones. Without referring to founding-era history, the Supreme Court has assumed without deciding that the Fourth Amendment could apply to noncitizens. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1034 (1984); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265–66 (1990); *see infra* pp. 32–33. Our court has mirrored this approach, assuming (without even discussing) that illegal aliens have Fourth Amendment rights. *See United States v. Urrieta*, 520 F.3d 569, 572, 579 (6th Cir. 2008); *cf. Wright v. Spaulding*, 939 F.3d 695, 702 (6th Cir. 2019) ("[Q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (quotation omitted)). The murky historical record and deliberately tentative

---

[4]*See also* Mass. Const. of 1780, art. XIV ("Every subject has a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions."); N.Y. Const. of 1777, arts. XXXV, XLI (incorporating "such parts of the common law of England, and of the statute law of England and Great Britain" and barring "acts of attainder"); N.C. Const. of 1776, arts. XI, XII (copying text of Magna Carta).

precedent fall far short of a clear holding that the Fourth Amendment applies to aliens, much less illegally present ones.

The majority now reads the Supreme Court's doubts about the First Amendment and cautious assumptions about the Fourth Amendment to support a firm holding that Second Amendment rights apply to illegal aliens. This double inference overextends the caselaw and runs contrary to the clear history. The Court has never stated that the First and Fourth Amendments attach to illegal aliens, much less that its tentative statements about those Amendments extend to an entirely different one. It's one thing to assume without deciding a question, but it's another to decide by assuming an answer.

## C. Alternative Terms

The Constitution's reliance on analogous terms like "person" and "citizen" further supports that "the people" was a term of art.

The framers knew their words had meaning, and they chose them with care. The Constitution's drafters were careful to use "persons" instead of "the people" when they were not referring to the American citizens who comprise the political community. *See* U.S. Const. art. I, §§ 2, 7, 9. They were equally precise when using "person" and "the accused" to describe guarantees they intended to attach to any individual within the United States. *Id.* amend. V ("No person shall . . . ."); *id.* amend. VI ("[T]he accused shall enjoy . . . ."). And when they chose those broader words, they paired them with the word "right," not the phrase "right of the people." *See id.* amend VI ("right to a speedy and public trial"); *id.* amend. VII ("right of jury trial"). As the Supreme Court has explained, these rights—unlike those reserved for "the people"—apply regardless of citizenship. *See Verdugo-Urquidez*, 494 U.S. at 265–66; *see also United States v. Carpio-Leon*, 701 F.3d 974, 978 (4th Cir. 2012).[5]

---

[5]The majority states that "the Court in *Verdugo-Urquidez* looked to the scope of 'persons' under the Fifth and Fourteenth Amendments as a guide to the scope of 'the people' under the First, Second, and Fourth Amendments." Maj. Op. at 6. But that "guide" revealed that the Fifth and Fourteenth Amendments "operat[e] in a *different* manner" than the First, Second, and Fourth Amendments precisely because they refer to "persons" instead of "the people." *Verdugo-Urquidez*, 494 U.S. at 264 (emphasis added).

The majority points to the founders' use of "citizen" as evidence that "the people" must mean something else. *See* Maj. Op. at 7–8. But that conclusion ignores the importance of context in selecting between synonymous words. *See Biden v. Nebraska*, 600 U.S. 477, 517 (2023) (Barrett, J., concurring) ("[T]he 'meaning' of a word or phrase 'may only become evident when placed in context.'"). After all, an "odor" isn't an "aroma," "frugal" people aren't necessarily "cheap," and "old" jeans aren't always "vintage." As the Declaration of Independence and Federalist Papers underscore, the founders referred to "the people" instead of "citizens" when describing limitations on the government imposed by a wary public. *See, e.g.*, U.S. Const. amends. I, IV, IX, X; The Declaration of Independence (U.S. 1776) (affirming that "the People" may "alter or abolish" the government); *see also Heller*, 554 U.S. at 580 n.6. But when referring to individual Americans—like a candidate for office—they opted for the term "citizen." *See, e.g.*, U.S. Const. art. I, § 2, cl. 2; *id.* art. I, § 3, cl. 3; *id.* art. II, § 1, cl. 5; *id.* art. IV, § 2, cl. 1. Though "the people" and "citizens" refer to a synonymous group, the terms carry distinct connotations that make their use appropriate in certain provisions.

\*     \*     \*

The repeated invocations of "the people" in the Constitution refer to American citizens who established the United States government. Illegal aliens—those who came here in violation of that government's laws controlling who's in and who's out—don't share in the right of American citizens to form, check, or alter the government.

Since they entered the country in violation of our laws, illegal aliens can't lay claim to a "right of the people" that was "necessary to the security of a free State." *Id.* amend. II. Their illegal entry, after all, poses a direct threat to that "security." And the founders recognized this when they listed a primary purpose of the Second Amendment right as "repelling invasion." *See Heller*, 554 U.S. at 597.

## IV. Precedent

Neither our sister circuits nor the Supreme Court have adopted the majority's approach. In fact, they have long rejected it.

A. Circuits

Start with an overview of our sister circuits' caselaw. The Fourth, Fifth, and Eighth Circuits have held that illegal aliens aren't part of "the people." *See United States v. Medina-Cantu*, 113 F.4th 537, 539 (5th Cir. 2024) (per curiam) (relying on *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011)), *cert. denied*, 145 S. Ct. 1318 (2025); *United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023) (relying on *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam)); *Carpio-Leon*, 701 F.3d at 982 ("[W]e hold that the Second Amendment right to bear arms does not extend to *illegal* aliens." (emphasis in original)). And in separate writings, several jurists have doubted that illegal aliens are encompassed by "the people." *See United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015) (Flaum, J., concurring) ("Unlike the majority, I have doubts that the Second Amendment grants undocumented immigrants the right to bear arms."); *United States v. Perez*, 6 F.4th 448, 461 (2d Cir. 2021) (Menashi, J., concurring in the judgment); *Medina-Cantu*, 113 F.4th at 543 (Ho, J., concurring).

At least five circuits, on the other hand, have assumed without deciding that "the people" could include illegal aliens. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022) (opting to "resolve this case more narrowly"); *Perez*, 6 F.4th at 453 (declining to "risk[] introducing difficult questions into our jurisprudence" (quotation omitted)); *United States v. Torres*, 911 F.3d 1253, 1261 (9th Cir. 2019) (describing the question as "large and complicated" (quotation omitted)); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012) (same). The Seventh Circuit recently joined this cadre, explaining that *Bruen* and *Rahimi*'s "sea change" cast doubt on a prior "outlier" opinion holding that some illegal aliens could be part of "the people." *United States v. Carbajal-Flores*, 143 F.4th 877, 882 (7th Cir. 2025) (citing *Meza-Rodriguez*, 798 F.3d 664).

The Sixth Circuit now stands alone. To the majority, "any argument . . . that the Second Amendment's use of 'the people' includes only citizens is bound to fail," and "historical evidence does not demonstrate that unlawfully present individuals are excluded from 'the people.'" Maj. Op. at 8. But after voicing its disbelief, the majority offers almost no affirmative

evidence to rebut the clear historical record.  That failure to grapple with the adverse history leaves the majority's reasoning incomplete and unpersuasive.

## B.  Supreme Court

The majority confidently states that "at no point . . . did the Supreme Court or this circuit, even in dicta, limit 'the people' to citizens."  *Id.* at 7.  But the Supreme Court has consistently restricted the rights of "the people" to American citizens who are part of the political community.

At the outset, the Court has repeatedly defined "the right of the people to bear arms" as a right of American citizens.  As *Heller* noted, we read the Second Amendment to "protect the right of citizens to carry arms," 554 U.S. at 595, in part because it secured a "citizen militia," *id.* at 599; *see also id.* at 581 ("[T]he Second Amendment right . . . belongs to all Americans."); *id.* at 600 ("[T]he Second Amendment protects citizens' right to use a gun."); *id.* at 603 (protecting "an individual citizen's right to self-defense"); *id.* at 625–26 ("[T]he Federal Government did not significantly regulate the possession of firearms by law-abiding citizens.").  *McDonald* follows this trend, referring repeatedly to gun ownership as a right and privilege of American citizenship.  *See, e.g., McDonald v. City of Chicago*, 561 U.S. 742, 767–68 (2010) ("[C]itizens must be permitted 'to use [handguns] for the core lawful purpose of self-defense.'" (internal citation omitted)); *id.* at 773 (referencing "the right of all citizens to keep and bear arms"); *id.* at 774 (same); *id.* at 779 (similar); *see also id.* at 806 (Thomas, J., concurring) ("[T]he right to keep and bear arms is a privilege of American citizenship."); *id.* at 809, 829, 830, 848, 849, 851–54, 858 (similar).  *Bruen* centered this language in its opening paragraph:  The Second Amendment "protect[s] the right of an ordinary, law-abiding citizen to possess a handgun."  597 U.S. at 8.  Throughout the opinion, it repeatedly noted that gun ownership was a right possessed by the "ordinary, law-abiding, adult citizens [who] are part of 'the people' whom the Second Amendment protects."  *Id.* at 31; *see also id.* at 9, 11, 26, 29, 30, 38, 60, 70.  *Bruen* finished where it started, striking down a state law that "prevent[ed] law-abiding citizens . . . from exercising their right to keep and bear arms."  *Id.* at 70.  And *Rahimi* picked up right where *Bruen* left off.  *See United States v. Rahimi*, 602 U.S. 680, 700, 701, 702 (2024).

The gun-rights cases did not pull this language from thin air. Since Reconstruction, the Court has repeatedly stated that rightsholders are citizens who participate in the political community. As it explained, "[c]itizens are the members of the political community . . . . who, in their associated capacity, have established or submitted themselves to the dominion of a government for . . . the protection of their individual as well as their collective rights." *Cruikshank*, 92 U.S. at 549. To "establish[] its own form of government," the state must retain the ability to "limit[] participation in that government to those who are within 'the basic conception of a political community.'" *Sugarman v. Dougall*, 413 U.S. 634, 642–43 (1973) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 344 (1972)). And "aliens are by definition those outside this community." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439–40 (1982). Consequently, "[t]he exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition." *Id.* at 439.[6] These cases acknowledged that the political community is comprised of citizens who participate in self-governance to the degree permitted by law.

Other cases confirmed that federal law does not consider aliens—even legally present ones—part of the political community. The Supreme Court has "take[n] measure of the difference between [the citizen's] status and that of all categories of aliens." *Johnson v. Eisentrager*, 339 U.S. 763, 769 (1950); *Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring) ("[A]n alien obviously brings with him no constitutional rights."). While citizens are entitled to the full scope of constitutional protection, an alien is afforded an "ascending scale of rights" based on his circumstances and the state's discretion. *Eisentrager*, 339 U.S. at 770. The power to extend or limit these rights "inheres in the State by virtue of its obligation, already noted above, 'to preserve the basic conception of a political community.'" *Sugarman*, 413 U.S.

---

[6]*See also Cabell*, 454 U.S. at 438 ("[A]lthough citizenship is not a relevant ground for the distribution of economic benefits, it is a relevant ground for determining membership in the political community."); *Ambach v. Norwick*, 441 U.S. 68, 73–74 (1979) ("[S]ome state functions are so bound up with the operation of the State as a governmental entity as to permit the exclusion from those functions of all persons who have not become part of the process of self-government."); *Foley v. Connelie*, 435 U.S. 291, 295–96 (1978) ("[W]e have recognized a State's historical power to exclude aliens from participation in its democratic political institutions as part of the sovereign's obligation to preserve the basic conception of a political community." (quotation modified)); *Elk v. Wilkins*, 112 U.S. 94, 109 (1884) (describing citizenship as "a political privilege which no one, not born to, can assume without its consent in some form"); *Maxwell v. Dow*, 176 U.S. 581, 608 (1900) (Harlan, J., dissenting) ("[T]he political community [was] known as the people of the United States . . . and every member of that political community was a citizen of the United States.").

at 647 (quotation omitted).  Limits on the alien's rights accord with the "immunities [he retains] from burdens which the citizen must shoulder," like the draft or jury service.  *Harisiades*, 342 U.S. at 586.  Because the alien doesn't bear the burdens of citizenship, he cannot enjoy the rights and privileges of it.  Those are, instead, reserved for "the people" of this country.

If aliens don't enjoy the full scope of constitutional rights, illegal aliens certainly don't either.  Neither lawfully present aliens nor "the illegal entrant[] can advance even a colorable constitutional claim to a share in the bounty that a conscientious sovereign makes available to its own citizens." *Mathews v. Diaz*, 426 U.S. 67, 80 (1976).  Indeed, affording "an entire menu of constitutional rights" to illegal aliens "*because* of, not in spite of, their unlawful entries" would create a perverse incentive to break the law.  *W.W.M. v. Trump*, 154 F.4th 207, 295 n.29 (5th Cir. 2025) (Oldham, J., dissenting), *vacated* 154 F.4th 319, 321 (5th Cir. 2025).  To avoid this, the law demands illegal aliens' removal or exclusion from the United States and bars them from the rights and privileges of citizenship in the American political community—such as voting in federal elections and serving on federal juries.  Criminal entry into the United States doesn't entitle illegal aliens to the constitutional rights of Americans.

The sovereign right to exclude underlies this longstanding distinction between the rights of citizens and illegal aliens.  *See Turner*, 194 U.S. at 279.  Over a century ago, the Court rejected an illegal alien's First Amendment challenge to a law permitting the United States to deport anarchists.  *See id.* at 292.  As the Court explained, aliens cannot "become one of *the people* to whom these [rights] are secured by our Constitution by an attempt to enter, forbidden by law."  *Id.* (emphasis added).  The Court's rationale lay in the nation's power to exclude foreigners:  "To appeal to the Constitution is to concede that this is a land governed by that supreme law, and as under it the power to exclude has been determined to exist."  *Id.*  By the same token, "those who are excluded cannot assert the rights in general obtaining in a land to which they do not belong as citizens or otherwise."  *Id.*  An appeal to law does not work when an alien's presence itself violates the law.

### C. *Verdugo-Urquidez*

The majority relies almost exclusively on an extraneous statement from *Verdugo-Urquidez*, a Fourth Amendment case, to conclude that illegal aliens have Second Amendment rights. In *Verdugo-Urquidez*, a Mexican drug kingpin asserted that the Fourth Amendment required suppression of evidence obtained by drug-enforcement agents during a warrantless search of his residence in Mexico. 494 U.S. at 262–63. The Supreme Court found that "the text of the Fourth Amendment, its history, and our cases . . . require rejection of [his] claim" because "he was a citizen and resident of Mexico with no voluntary attachment to the United States." *Id.* at 274–75.

What relevance does this case have for ours? In passing, the Court said that "the people . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 265. That single line suggests that noncitizens with "sufficient connection" to the "national community" could access the rights of American citizens. Acknowledging that the discussion was unrelated to the holding, the Court described its own analysis of the Constitution as an unprompted "textual exegesis" that was "not conclusive." *Id.*

*Verdugo-Urquidez* cannot bear the weight the majority places upon it. At the outset, *Verdugo-Urquidez* deliberately avoided deciding whether illegal aliens can assert constitutional protections. The opinion's most direct reference to the rights of illegal aliens is a citation parenthetical stating that "an attempt to enter forbidden by law" cannot make an alien "one of the people." *Id.* at 265 (citing *Williams*, 194 U.S. at 292); *see Portillo-Munoz*, 643 F.3d at 440 (finding that *Verdugo-Urquidez* did not hold "that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally"); *Carpio-Leon*, 701 F.3d at 978 (noting that *Verdugo-Urquidez* "did not rule on whether illegal aliens were part of 'the people'"). The Court simultaneously critiqued lower courts for relying on earlier Supreme Court precedent that "assum[ed] without deciding" that illegal aliens could be entitled to Fourth Amendment protection. *Verdugo-Urquidez*, 494 U.S. at 272 (citing *Lopez-Mendoza*, 468 U.S. at 1034). As the Court explained, "such assumptions" are "not binding" and "not dispositive" on courts directly addressing the rights of illegal aliens. *Id.* When the majority

infers that illegal aliens have Fourth Amendment protections from the Court's tentative assumptions, it replicates the exact error that the Supreme Court reversed in *Verdugo-Urquidez*.

When examined against the historical record, *Verdugo-Urquidez*'s assumption appears untenable. *Verdugo-Urquidez* does not pretend that its analysis was rooted in historical evidence. And the absence of historical evidence matters. The "pre-ratification and post-ratification history" of how the founding generation understood "the people" should "function as a gravitational pull on [this] Court's interpretation of precedent." *Rahimi*, 602 U.S. at 730 (Kavanaugh, J., concurring). "When determining how broadly or narrowly to read a precedent" like *Verdugo-Urquidez*, a court should keep constitutional text and history at top of mind. *Id.*; *cf. Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 615 (2007) (recognizing that precedent need not "always [be] expanded to the limit of its logic"). Here, both text and history counsel against overreading *Verdugo-Urquidez*'s language to encompass illegal aliens.

Indeed, when the Supreme Court ultimately reviewed the historical record in *Heller*, it squarely foreclosed any reading of *Verdugo-Urquidez* that permits illegal aliens to have Second Amendment rights. Interpreting the text of the Second Amendment, rather than the Fourth, *Heller* clarified that "the people" "unambiguously refers to all members of the *political* community"—not, as *Verdugo-Urquidez* stated, the "national community." *Compare Heller*, 554 U.S. at 581 (emphasis added), *with Verdugo-Urquidez*, 494 U.S. at 265. *Heller*'s switch from "national" to "political" community underscores that illegal aliens cannot be part of "the people" with Second Amendment rights. Even if aliens are part of the geographic "national community," they lack the civic rights that belong to American citizens who participate in the political community. *Heller*'s Second Amendment holding therefore squarely forecloses the majority's reading of *Verdugo-Urquidez*'s extraneous statement. So, after *Heller*, *Verdugo-Urquidez*'s test must be understood as limited to citizens with political rights, especially in the Second Amendment context.

Even by its own terms, *Verdugo-Urquidez*'s statement is all but impossible for courts to apply consistently, objectively, and fairly. How does a court determine whether an alien has a "sufficient connection" to the national community? Most factors that might suggest a "connection" cut both ways. Crediting an illegal alien for his length of residence, for instance,

rewards him for his continuing unlawful presence. *Cf. Meza-Rodriguez*, 798 F.3d at 673. Counting American children or an American spouse unfairly penalizes the unmarried, childless, or young. *Cf. Jimenez-Shilon*, 34 F.4th at 1045. Weighing nonpolitical civic participation—like working, paying taxes, or philanthropy—invites subjective judgments about the value of an alien's activities. *Cf. id.*; *Portillo-Munoz*, 643 F.3d at 447 (Dennis, J., concurring in part and dissenting in part). And, since *Verdugo-Urquidez* evaluates "sufficien[cy]," these factors presumably don't stand in isolation and aren't checkboxes. This means courts might be required to weigh opposing factors against one another or make relative assessments of the strength of each factor. The end result? An unwieldy multifactor balancing test forcing courts to make value-laden judgments about what makes a member of the national community.

Or they can simply do what our court does today. The majority suggests that an alien develops "substantial connections" when he "enter[s] voluntarily and accept[s] some societal obligations."**[7]** Maj. Op. at 6. It then concludes that Escobar-Temal falls into this category because he "worked as a flooring contractor and had two American citizen children." *Id.* at 11. During that time, he "lived in the same community for approximately a decade until his detention" for sexually abusing a child. *Id.* Aside from those pending charges and his stipulated crime of illegal entry, he "ha[d] no criminal convictions." *Id.* But the majority's analysis raises more questions than it answers. Would five years in the United States be enough? Part-time work? One child? And how do we count the stepdaughter he was accused of sexually assaulting? The majority's three-sentence analysis provides little guidance for the district courts that will apply this test to other illegal aliens asserting constitutional protections in future cases.

And, really, why should courts get to pick and choose what connections make someone American? Today's majority decides Escobar-Temal is part of "the people" based on his decade of residence, two kids, and job as a flooring contractor. The subtext is that certain choices— indeed, *those* choices—make someone American. But the fundamental blessing of American citizenship has always been the freedom to choose how to live. The majority gets this backwards

---

**[7]**Criminals are more culpable for voluntary than involuntary conduct. Indeed, in many respects, that was the basis for the Executive Branch's decision to defer deportations for children who were brought to the United States involuntarily or unknowingly. Perplexingly, the majority now adopts a rule that involuntary entrants—like DACA recipients—would have fewer rights than intentional entrants. Maj. Op. at 6, 11.

when it suggests that only noncitizens who live in a certain way become entitled to the rights of Americans. I worry that this test will ultimately award constitutional rights based on the luck of the panel draw. Maybe tomorrow's majority will apply this reasoning to extend constitutional rights to the married investment banker while denying them to the childless electrician. Or perhaps future panels will decide a long-present illegal alien with a lengthy rap sheet deserves constitutional rights while a law-abiding recent arrival does not. We should stay out of the moralizing business of judging what makes an American.

Instead, the Constitution wisely placed those types of decisions in the hands of our elected representatives. Congress determines what qualifies an alien to become an American citizen. *See* U.S. Const. art. I, § 8, cl. 4. Short of citizenship, the Executive Branch decides when an alien may be entitled to other benefits. Congress and the President's determinations about aliens' status are "ow[ed] . . . special deference" by the courts because the admission and exclusion of aliens is "exclusively entrusted to the political branches." *Carpio-Leon*, 701 F.3d at 982; *Harisiades*, 342 U.S. at 589. Any reading of *Verdugo-Urquidez* that requires courts to perform an individualized assessment of an alien's "connection" to the "national community" suggests that lower courts have the power to second-guess the privileges extended by the coordinate branches. At its worst, the majority's view allows courts to adjust aliens' status to grant them the rights of citizens—the exact role that Congress delegated to the executive, then insulated from judicial review. *See* 8 U.S.C. § 1252(a)(2)(B).

The Supreme Court never intended its "textual exegesis" in *Verdugo-Urquidez* to be the dispositive test to determine the rights of noncitizens. As a result, the majority should have applied *Heller* as the Supreme Court's most recent interpretation of *Verdugo-Urquidez* in the Second Amendment context. If it had done so, it would have concluded that illegal aliens are not part of the "political community" and thus not entitled to the same rights as citizens. As it stands, the majority's reasoning runs contrary to the text, history, and tradition that the Supreme Court has instructed us to consider.

\*     \*     \*

"We, the People of the United States," means something specific—the citizens of the United States.  Constitutional text, founding-era history, and Supreme Court precedent all dispositively show this.

Despite the overwhelming evidence, the majority concludes that an illegal alien could be part of "the People," and thus entitled to carry firearms.  I disagree with that conclusion.  But because the majority ultimately decides Escobar-Temal's conviction was consistent with the Second Amendment, I concur only in the judgment.